Opinion by
Judge Rogers,
Columbia Gas Transmission Corporation (hereinafter referred to as appellant, taxpayer or Columbia), a Delaware corporation, has appealed from a decision and order of the Board of Finance and Revenue sustaining the action of the Department of Revenue and the Auditor General in computing and settling Columbia’s liability for Excise Tax on Foreign Corporations for the period from *527 July 1, 1971 through December 31, 1971 in the amount of $191,143.92.
The parties have entered into a stipulation of facts from which we make findings as follows:
1. Columbia Gas Transmission Corporation is a Delaware corporation authorized to do business in Pennsylvania.
2. Columbia is a natural gas transmission company engaged in the sale, storage and delivery in interstate commerce of natural gas for resale to other subsidiaries of its parent company, Columbia Gas System, Inc., and to other gas distributors in Pennsylvania, New York, Virginia, Maryland, West Virginia, Kentucky and Ohio. It is licensed to conduct its interstate activities by the Federal Power Commission and its sales are within the exclusive jurisdiction of that Commission. Columbia’s Pennsylvania operations are an integral part of its overall interstate operations.
3. Columbia maintains three division offices, one each in Pennsylvania, New York and Maryland at which the maintenance, construction and operation of its interstate pipelines in Pennsylvania, New York, Ohio, Maryland and West Virginia are regulated.
4. Columbia is the successor by merger to Manufacturer’s Light and Heat Company, a former Pennsylvania domestic corporation, which merger was effective at the close of business on June 30, 1971.
5. Prior to the merger, Manufacturer’s Light and Heat Company paid the Commonwealth of Pennsylvania Excise Tax on Domestic Corporations of $150,000 on authorized capital stock having an aggregate par, or stated, value of $75,000,000.
6. Columbia filed its Foreign Excise Tax Report with the Department of Revenue for the short period July 1, 1971 through December 31,1971, reporting the following:
*528 $83,064,877 Amount of capital actually employed within Pennsylvania, including gas stored underground ($6,263,094)
- 25,747,447 Credit claimed from mergers
57,317,430 Increase of capital employed in Pennsylvania subject to Excise Tax Law
Amount of tax due (one-third of one per cent) $190,866.94
■7. The settlement made by the Department of Revenue and approved by the Department of the Auditor General, sustained by the Board of Finance and Revenue, and here appealed was:
Amount of capital actually employed within Pennsylvania $83,064,877
Increase of capital subject to tax $83,064,877
Tax of one-third of one per cent of increase $276,882.92
Less credit for merger of Manufacturer’s Light & Heat Co. 85,739.00
Amount of settlement $191,143.92
8. The Department of Revenue failed to use any apportionment formula in computing the Foreign Excise Tax due by Columbia, simply applying the statutory rate of one-third of one per cent to the increase of capital actually employed within Pennsylvania.
9. The ratio of Columbia’s pipeline cubic foot capacity in Pennsylvania to total pipeline cubic foot capacity is 12.2392%. If this ratio should be applied to Columbia’s capital actually employed in Pennsylvania ($83,064,877) the increase of capital would be $10,166,476 and the Foreign Excise Tax at the rate of one-third of one per cent would be $33,888.22.
10. Included within the total of Columbia’s assets actually employed within Pennsylvania amounting to $83,064,877 is $6,263,094, being the value of gas which *529 at December 31, 1971 was in fields in Pennsylvania in the course of movement through, into or out of Pennsylvania as part of Columbia’s interstate supply system.
11. The Department of Revenue calculated the credit allowed for the $150,000 of Domestic Excise Tax paid by Manufacturer’s Light and Heat Company by ascertaining the ratio of the value of the assets, both tangible and intangible, of Manufacturer’s actually employed within Pennsylvania to total assets, both tangible and intangible, of Manufacturer’s, thus:
Pennsylvania assets Total assets $100,855,782 176,446,685 ' 57.1593521
Excise Taxes paid 150,000
Per cent applicable to Pennsylvania 57.1593521
Credit allowed $85,739
12. The value of capital actually employed within Pennsylvania by Manufacturer’s transferred to Columbia was $80,647,832 and, as found, the value of capital actually employed during the tax period by Columbia was $83,064,877, a difference of $2,417,045. Such additional capital, without apportionment, would result In Foreign Excise Tax of $8,056.82.[1]
13. In asertaining Columbia’s Foreign Excise Tax and its credit for Manufacturer’s payments of Domestic Excise Tax, the Commonwealth’s taxing authorities treated gas stored underground in Pennsylvania a tangible asset. Columbia contends that natural gas is intangible not subject to Foreign Excise Tax.
14. If natural gas is an intangible asset, a calculation of the credit provided by the Foreign Excise Tax for
*530 Manufacturer’s payment of $150,000 in Domestic Excise Tax would be as follows:
Amount of Manufacturer’s capital actually employed in Pennsylvania 74,384,738
Amount of Manufacturer’s = 60.2728%
capital in toto 123,413,500
.602728 X 150,000 = $90,409.20
15. During the twenty-five year period from 1952 through 1973, the Commonwealth has derived more than twice as much revenue from Foreign Excise Taxes as from Domestic Excise Taxes, although there were several times more domestic corporations subject to Excise Tax than foreign corporations subject thereto. During the year 1971, total revenues derived from Foreign Excise Taxes were $4,339,022, while total Domestic Excise Tax revenues were $1,203,369. For the year 1971 domestic corporations subject to the Domestic Excise Tax totaled approximately 99,000, while foreign corporations subject to the Foreign Excise Tax totaled only approximately 12,000. Thus, one-eighth as many foreign corporations paid more than three times as much excise tax as did domestic corporations.
16. The Foreign Excise Tax Act exempts foreign insurance companies employing capital wholly within Pennsylvania. As a matter of Commonwealth tax law and administration, foreign insurance companies employing capital wholly within the Commonwealth have never been subject to nor have they paid Franchise Tax or Corporate Net Income Tax.
Columbia presents for our consideration a host of questions, providing suggested results ranging from an optimum result for it of no Foreign Excise Tax and a credit of $150,000, to at worst for it of a total Foreign Excise Tax in the amount computed by the Department of $276,882.92 less a credit of $90,409.20 instead of the *531 $85,739 allowed by the Department. The Commonwealth insists that it correctly settled Columbia’s liability for the Foreign Excise Tax.
The enactments which are centrally involved in the case are, first, the Excise Tax on Foreign Corporations,[2] Article X, embracing Sections 1001 through 1006 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, 72 P.S. §§8001 to 8006 (Supp. 1974-1975), and second, so-called Excise Tax on Domestic Corporations, imposed by the Act of July 25, 1953, P.L. 564, formerly at 72 P.S. §§1827.2 to 1827.10, repealed by Section 8 of the Act of July 12, 1972, P.L. 769, 1972 Purdon’s Pennsylvania Legislative Service, Issue No. 2, pages 458, 461.[3]
The pertinent provisions of the Excise Tax on Foreign Corporations, just cited, are:
“Section 1001. Definitions.
“The following terms when used in this article shall have the meanings ascribed to them in this section:
“(1) ‘Foreign corporation’ means any corporation, limited partnership or joint-stock association chartered or created by or under the laws of any other state or of the United States or of any foreign country, which has been issued a certificate of authority by the Department of State to do business within this Commonwealth and which either (i) has its principal office or chief place of business located within this Commonwealth, or (ii) has any part of its capital actually employed within this Common *532 wealth. The term ‘foreign corporation’ shall not include foreign insurance companies and foreign nonprofit corporations which do not have capital stock.
“(2)' ‘Increase of capital’ means, (i) as to foreign corporations doing business in this Commonwealth, any increase of capital in excess of the amount actually employed in this Commonwealth at any time prior to January 1, 1971 by such corporations reporting on a calendar year basis, or at any time prior to the first day of any fiscal year, beginning in the calendar year 1971, by such corporations reporting on a fiscal year basis; (ii) as to corporations admitted to do business in this Commonwealth after the effective date of this article, capital actually employed within this Commonwealth at the time of or after receiving a certificate of authority to do business from the Department of State and any increase thereof.
“Section 1002. Imposition of tax.
“From and after the effective date of this article, every foreign corporation, in addition to complying with all the laws of the Commonwealth now or hereafter in effect, shall, for the privilege of exercising its franchises in Pennsylvania, pay to the department an excise tax of one-third of one per cent upon the amount of any increase of capital actually employed within this Commonwealth: Provided: That credit shall be alloived for said excise tax in the following cases:
“(1) Merger of domestic corporation or corporations and/or foreign corporation or corporations with a foreign corporation and the surviving foreign corporation in the merger is then authorized, or will immediately thereafter be authorized, by a certificate of authority to transact business in this Commonwealth.
“(2)' Consolidation of two or more foreign corporations or of domestic and foreign corporations *533 (one or more of each), and the corporation formed by the consolidation is a foreign corporation which is then authorized, or will immediately thereafter be authorized, by a certificate of authority to transact business in this Commonwealth.
“In such cases, the surviving or consolidated foreign corporation shall be entitled to credit upon any excise tax due and payable hereunder equal to the excise tax computed at the rate of one-third of one per cent on the value of the assets of the merging or consolidating foreign corporation or corporations actually employed by such surviving or consolidated foreign corporation within this Commonwealth within the provisions and intent of this article, and such proportion of the total excise tax of the merging or consolidating domestic corporation or corporations paid or relieved from payment on its authorized or issued and outstanding capital stock, determined by the ratio that the value of the assets of such domestic •corporation or corporations actually employed by such surviving or consolidated foreign corporation ivithin this Commonwealth within the provisions and intent of this article bears to the value of the total assets of such domestic corporation.
“(3) In arriving at the amoumt of tax due under this article, a taxpayer shall apportion the increase in capital by the use of the relevant formula applicable to the operations of the corporation as set forth in section U01.” (Emphasis supplied.)
The word “relevant” appearing in Section 1002(3) was added by the Act of September 9, 1971, P.L. 437.
The Excise Tax on Domestic Corporations, Act of July 25, 1953, P.L. 564 imposed a tax of one-fifth of one per cent for the privilege of exercising corporation franchise or other powers or privileges on the amount of the stated capital or any increase therein of domestic corporations. It defined stated capital as the number of shares *534 having par value times the par value thereof or the value in dollars of the consideration received for shares without par value. The Act further provided in the case of a foreign corporation becoming a domestic corporation, and becoming liable thereby to tax on its capital stock or stated capital, that the domestic corporation should be entitled to a credit from the payment of the tax equal to the capital upon which it had theretofore paid in Excise Tax on Foreign Corporations.[4]
The differences between the two enactments — the Excise Tax on Foreign Corporations provided in Article X of The Tax Reform Code of 1971 and the Excise Tax on Domestic Corporations provided in the Act of July 25, 1953, P.L. 564 — , aside from the obvious one that taxpayers are respectively foreign and domestic corporations, are: (1) the Excise Tax on Foreign Corporations is imposed on the increase of capital, that is, on tangible property[5] actually employed within Pennsylvania whereas the Excise Tax on Domestic Corporations is imposed on its entire stated capital, (2) the rate imposed by the Excise Tax on Foreign Corporations is (and was under its predecessor Act of July 25, 1953, P.L. 560) one-third of one per cent and that imposed by the Excise Tax on Domestic Corporations was one-fifth of one per cent, and *535 (3) the Excise Tax on Foreign Corporations provides a credit against the tax due by a surviving or consolidated foreign corporation for excise tax previously paid by a domestic corporation included in a merger or consolidation determined by the ratio that the value of the assets of the domestic corporation actually employed by the surviving or consolidated foreign corporation within the Commonwealth bears to the total assets of such domestic corporation, whereas the Excise Tax on Domestic Corporations provided credit to a domestic corporation surviving a merger or consolidation in the full amount of the excise tax paid by the foreign corporation included in the consolidation or merger.
Columbia attacks the Excise Tax on Foreign Corporations on a number of constitutional grounds. None has merit.
Columbia first asserts that the tax applied to it violates the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3.[6] It points in this regard to the stipulation of fact that it is engaged in interstate commerce and that its Pennsylvania operations are an integral part of its overall interstate operations, and argues that since Section 1002, 72 P.S. §8002 (Supp. 1974-1975) declares the tax to be for the privilege of exercising its franchise in Pennsylvania, the tax is on interstate commerce. The tax, however, is not on interstate commerce; it is on tangible property employed by foreign corporations in Pennsylvania. As the Supreme Court of the United States declared in Illinois Central Railroad Co. v. Minnesota, 309 U.S. 157, 164 (1940):
“The right of a state to tax property, although it is used in interstate commerce, is well settled. And certainly if such tax has a fair relation to the property employed in the state ... it cannot be said' to run *536 afoul of the prohibition against state taxation on interstate commerce. As Chief Justice Fuller once said on that point, ‘... by whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefore, ascertained by reference thereto, it is not open to attack as inconsistent with the Consitution. . . .’ ”
Further, in Memphis Natural Gas Co. v. Stone, 335 U.S. 80 (1948), a franchise or excise tax measured by the value of capital used within the State was upheld on facts not materially dissimilar from those of the instant case. In Memphis, the foreign corporation also operated a pipeline for the transportation of natural gas running across a number of states, including Mississippi, whose tax was under question. It was stipulated that the taxpayer had not engaged in intrastate commerce in Mississippi, that it had only one customer within the state to which it sold gas from its interstate line at wholesale, that it had not qualified to do intrastate business within Mississippi, and that it had no office within the State. The cases relied on by Columbia here[7] were analyzed and distinguished in the following fashion:
“However, a state tax upon a corporation doing only an interstate business may be invalid under our decisions because levied (1> upon the privilege of doing interstate business within the state, or (2) upon some local event so much a part of interstate business as to be in effect a tax upon the interstate business itself. Petitioner asserts that the Mississippi statute so offends.
“First. This Court has drawn the distinction in the field of pipe line taxation between state statutes on the privilege of doing business where only interstate business was done and those upon appropriate *537 local incidents. In Ozark Pipe Line Corp. v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L. Ed. 439, the Ozark Pipe Line Corporation operated an oil pipe line from Oklahoma, through Missouri to a point in Illinois. Oil was neither received nor delivered in Missouri. This was interstate transportation. Interstate Natural Gas Co. v. Power Comm’n, 331 U.S. 682, 689, 67 S.Ct. 1482, 1486, 91 L.Ed. 1742, and cases cited at note 12. It had its principal office in Missouri. It had a license from Missouri authorizing it to engage ‘ “exclusively in the business of transporting crude petroleum by pipe line.” ’ 266 U.S. Page 561, 45 S.Ct. 184, 185, 69 L.Ed. 439. The state tax was an apportioned franchise tax. It was construed by this Court as a tax ‘upon the privilege or right to do business,’ 266 U.S. Page 562, 45 S.Ct. 185, 69 L.Ed. 439. Virginia v. Imperial Coal Co., 293 U.S. 15, 20, 55 S.Ct. 12, 14, 79 L.Ed. 171. As such a tax upon a corporation doing only an interstate business, it was held invalid under the Commerce Clause.
“In State Tax Commission v. Interstate Natural Gas Co., 284 U.S. 41, 52 S.Ct. 62, 76 L.Ed. 156, a pipe line ran from Louisiana through Mississippi and back to Louisiana. Two local Mississippi distributors took gas in that state from the respondent. Mississippi sought to tax the respondent under a privilege tax law that required the pipe line company to get a license to exercise the privilege desired, that is, to operate an interstate pipe line. This Court held that the entire business of the respondent was interstate despite a claimed local activity by the reduction of pressure to deliver gas to the Mississippi distributors. It followed that the state license for the privilege of engaging in the business of operating a pipe line was an invalid burden under the Commerce Clause.
“On the other hand, in Interstate Natural Gas Co. v. Stone, 308 U.S. 522, 60 S.Ct. 292, 84 L.Ed. 442, *538 we affirmed per curiam a judgment of the Fifth Circuit in Stone v. Interstate Natural Gas Co., 103 F.2d 544, an the authority of Southern Gas Corporation v. Alabama, supra, 301 U.S. at 153, 156, 157, 57 S.Ct. 699, 700, 81 L.Ed. 970. The tax in question in the 308 U.S. case was exacted by the same Mississippi statute employed here. This differs from the Mississippi statute in the Interstate case in 284 U.S. The Interstate case in 308 U.S. differed from this present case, so far as its material, only in the fact that the foreign corporation filed a copy of its charter as a prerequisite to doing business in Mississippi and appointed an agent for the service of process. The page references in the Stone citation of the Southern Gas case show that this Court considered the Mississippi tax in the Stone case as one not on business but ‘ “on the privilege of exercising corporate functions within the State and its employment of its capital in [Mississippi].” ’ Southern Gas Corp. v. Alabama, supra, 301 U.S. 153, 57 S.Ct. 698, 81 L.Ed. 970. In the Southern Gas case, 301 U.S. page 155, 57 S.Ct. 699, 81 L.Ed. 970, the company did intrastate business but in the Stone case, no intrastate business was done. Thus the local event of qualifying for intrastate business which occurred in both Southern Gas and Stone, brought a different result from that in the Ozark case and in Interstate, 284 U.S., where the privilege or right to do interstate business was protected....
“Second. We come now to the second question. That is whether the challenged excise for carrying on within the state the aforementioned activities of maintenance, repair and manning by a corporation engaged solely in interstate commerce may be taxed). The answer on this point depends upon whether these activities are so much a part of the interstate business as to be under the protection of the Commerce Clause as this Court has construed it. In this case the local *539 activities are those involved in the maintenance of the pipe line. This tax is not an unapportioned tax on gross receipts from the commerce itself. It is measured by a proportion of the capital employed within the state. It cannot be duplicated in other states. Compare Western Live Stock v. Bureau, 303 U.S. 250, 255, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944. In Ozark Pipe Line v. Monier, supra, this Court, 266 U.S. at page 565, 45 S.Ct. 186, 69 L.Ed. 439, spoke of such activities as set out below. If it was intended to say that such in-the-state activities as there - described could not be taxed, we disagree with that conclusion. We are inclined to the view that the fact that the tax there under consideration was considered a tax ‘upon the privilege or right to do business,’ led the Court to point out that as the local activities were essential to that business, they were not taxable activities. The pipe line itself and all appurtenances are essential, yet an ad valorem tax can be laid.
“In taxation, we do not have the problems raised by many decisions on state regulations alleged to impede the free flow of commerce when not nationally uniform. Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915. Regulations may be imposed by the state on commerce. Panhandle Eastern Pipe Line Co. v. Public Service Comm’n, supra; Bob-Lo Excursion Co. v. Michigan, 333 U.S. 28, 68 S.Ct. 358. When state taxation of activities or property within a state is involved, different considerations control. It is no longer a question of actual interruption of the operation of commerce. Kelly v. Washington, 302 U.S. 1, 14, 58 S.Ct. 87, 82 L.Ed. 3. Rather a prohibited tax exaction is one beyond the power of the state because the taxable event is outside its boundaries, McLeod v. Dilworth Co., supra, or for a privilege the state cannot grant. Is it bad because a tax on the commerce itself? We have sustained a fee for the *540 privilege of using state courts, exacted by the state from a business licensed by the United States to handle customs charges. Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227. Likewise a special privilege tax upon an interstate automobile transportation company for the use of the state roads has been approved. Aero Mayflower Transit Co. v. Board of Railroad Comm’rs, 332 U.S. 495, 68 S.Ct. 167.
“The Mississippi excise has no more effect upon the commerce than any of the instances just recited. The events giving rise to this tax were no more essential to the interstate commerce than those just mentioned or ad valorem taxes. We think that the state is within its constitutional rights in exacting compensation under this statute for the protection it affords the activities within its borders. Of course, the interstate commerce could not be conducted without these local activities. But that fact is not conclusive. These are events apart from the flow of commerce. This is a tax on activities for which the state, not the United States, gives protection and the state is entitled to compensation when its tax cannot be said to be an unreasonable burden or a toll on the interstate business.” 335 U.S. at 88-96.
The stipulation here includes the facts that Columbia resells its gas to distributors in Pennsyvania and that it maintains a division office in Pennsylvania at which the maintenance, construction and operations of its interstate pipelines are regulated. Therefore, not only is the instant tax on property employed in the State, it is justified by local activities carried on within and protected by the State for which compensation measured by such domesticated property may constitutionally be exacted.
Columbia next contends that a comparison of the Excise Tax on Foreign Corporations and the Excise Tax on Domestic Corporations reveals that foreign corporations have been subjected to discriminatory treatment *541 both with regard to the imposition of the tax itself and the allowance of credits; and that the uniformity requirement of Article 8, Section 1 of the Pennsylvania Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution are thus violated. It points in this regard to the fact that the Excise Tax on Domestic Corporations is at the rate of one-fifth of one per cent, whereas the tax on the increase of capital located wholly in Pennsylvania imposed by the Excise Tax on Foreign Corporations is at the rate of one-third of one per cent. It further contends that the stipulated fact that less revenues are received by the Commonwealth from more corporations by the Excise Tax on Domestic Corporations than is received from fewer taxpayers by the Excise Tax on Foreign Corporations demonstrates discrimination. It finally complains that the credit provisions in the respective acts provide a full credit to surviving domestic corporations for excise taxes paid by merging or consolidating foreign corporations, whereas the foreign corporation successor of a merger or consolidation with a domestic corporation receives a credit for excise tax paid by the domestic corporation computed by applying a ratio of Pennsylvania assets to total assets of the merging domestic corporation. Columbia’s contentions are again without merit. The early case of Germania Insurance Co. of New York v. Commonwealth, 85 Pa. 513 (1877) squarely holds that under the uniformity clause the Legislature has power to classify the subjects of taxation “and that foreign insurance companies may be placed in a class by themselves, and distinct from domestic insurance companies, and may be taxed independently and differently.” 85 Pa. at 519. The most recent review by our Supreme Court of the subjects of uniformity and equal protection in taxation is to be found in Alco Parking Corp. v. Pittsburgh, 453 Pa. 245, 254-258, 307 A.2d 851, 855-56 (1973), reversed on other grounds, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974), where the court
*542 rejected an attack on these grounds on a tax on the business of parking motor vehicles:
“This argument, presented to and rejected by this Court on numerous prior occasions, must, once again, be rejected. It is well established that the Commonwealth and its political subdivisions, in the exercise of the taxing power, are subject to the requirements of equal protection and uniformity. ... However, the taxing authority must by necessity possess wide discretion for purposes of taxation of various businesses or occupations.... and the cases cited therein.
“In [Commonwealth v.] Life Assurance Co., [419 Pa. 370, 214 A.2d 209 (1965)] this Court noted:
“ ‘The equal protection clause imposes no iron rule of equality prohibiting that degree of flexibility and variety appropriate to reasonable schemes of taxation. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 525, 79 S.Ct. 437, 440 (1959).
“ ‘The only constitutional limitation placed upon the power of the Legislature to distinguish between various entities for purposes of taxation is that their basis for doing so be reasonable____And the burden of showing that the classification employed by the Legislature is not reasonable is upon the party attacking the tax. . . . ‘Especially is this so in light of the often reaffirmed rule that... “ ‘[legislation] will, not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution.’ ” '
“Moreover, the burden of proving the classification is unreasonable is a heavy one----‘So long as the classification imposed is based upon some standard capable of reasonable comprehension, be that standard based upon ability to produce revenue or some other legitimate distinction, equal protection of the law has been afforded.’... Merely because ‘a statute may discriminate in favor of a certain class does not render it arbitrary if the discrimination is founded upon a *543 reasonable distinction, or difference in state policy. American Sugar Refining Co. v. State of Louisiana, 179 U.S. 89, 21 S.Ct. 43.’... Thus a tax based on a reasonable classification is not unconstitutional because one class may be placed at a competitive disadvantage. ...
“The determinative question, then, is whether the classification imposed by the Parking Tax Ordinance is a reasonable one. We said in Commonwealth v. Life Assurance Co. of Pa., supra at 378-79, 214 A.2d at 215 that: ‘... the essential question in testing the validity of such measures ... is whether the distinctive treatment accorded rests upon substantial differences between the subjects so classified.... And where such distinctions rest upon differences recognized and acted upon by the business world, it is not within the province of the courts to intrude.... So long as the classification is neither capricious nor arbitrary, there is no denial of the equal protection of the law....’ (Citations omitted.)
“This Court has in the past sustained numerous types of distinctive tax treatment of a wide diversity of businesses and occupations....
“Commercial parking lots are without question a proper subject for local, municipal taxation. The City of Pittsburgh has decided, not without reason, that commercial parking operations should be singled out for special taxation to raise revenues because of traffic related problems engendered by these operations. This Court cannot say that placing such businesses in a separate taxable class is, ipso facto, an action so devoid of any reasonable basis as to constitute a violation of either the equal protection clause of the United States Constitution or the uniformity clause of the Pennsylvania Constitution. ‘... [W] here the state seeks to raise revenue, it need not justify any distinction drawn between the taxed and nontaxed with *544 respect to the raising of revenue so long as some other reasonable basis for treating the various classes differently exists. Where such distinction exists, the wisdom of the legislative policy of taxing one class and not another is not a matter for the courts. “Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and an earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.” Chicago, Burlington & Quincy R. Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 263 (1911).’ Commonwealth v. Life Assurance Co. of Pa., supra at 377-78 n.11, 214 A.2d at 215 n.11.”
In Allied Stores of Ohio v. Bowers, 358 U.S. 522 (1959), an Ohio enactment imposing ad valorem tax on merchandise of residents, but exempting such merchandise owned by nonresidents, was upheld against an attack based on the equal protection clause.
The rule is that a state may classify subjects of taxation and impose different rates on different subjects so classified if the class selections are not purely arbitrary but rest upon reasonable considerations of differences among, or of taxing policy with respect to, the classes. Further, the classifications will be upheld if any set of facts reasonably can be conceived that would sustain them. The Foreign Excise Tax on Corporations meets these tests.
Further, the cases from which the appellant has copiously quoted are clearly distinguishable because each involved an enactment in which the classification arose out of the contested legislation, not as here where the appellant searches for violations of the constitutional provisions by comparing the enactment to another statute ap *545 plicable to another class of taxpayers. See Commonwealth v. Life Assurance Company of Pennsylvania, 419 Pa. 370, 375, n.10, 214 A.2d 209, 213 (1965).
Columbia’s constitutional attack on the credit provisions of the two statutes is simplistic and somewhat disingenuous. The Excise Tax on Domestic Corporations provides a credit to the surviving domestic corporation in the full amount of excise tax paid by a merging foreign corporation, and the Excise Tax on Foreign Corporations provides a credit to the surviving foreign corporation for only that portion of the excise tax paid by the former domestic corporation as results from multiplying the Pennsylvania assets by the ratio of the former domestic corporation’s Pennsylvania assets to its total assets. We find no discrimination in this regimen. Since the surviving domestic corporation will henceforth pay excise tax on its entire capital wherever employed, and since its constituent former foreign corporation paid excise tax on its tangible property located only in Pennsylvania, the surviving domestic corporation is quite logically given full credit for the taxes formerly paid on those Pennsylvania properties. Since the surviving foreign corporation will henceforth pay excise tax only on its tangible property in Pennsylvania, it is similarly logical that the amount of credit allowed it for the excise taxes paid by a merging domestic corporation should by apportionment be reduced to an amount representative of taxes which were paid on Pennsylvania assets. Columbia’s brief suggests that in all cases the credit to the surviving foreign corporation will be less than 100 % of the tax paid by the merging domestic corporation. This is not the case. If all the assets of the former domestic corporation were located within Pennsylvania, as would often be the case, full credit would accrue to the surviving foreign corporation. In any event, on the principles hereinbefore recited, we see no constitutional infirmity in the different means of providing credits to different entities subjected to different taxes.
*546 The more difficult question raised by the appellant is one of statutory construction. As the findings demonstrate, the Commonwealth computed Columbia’s Excise Tax on Foreign Corporations by applying the rate of one-third[1] of one per cent to its capital employed within Pennsylvania, without apportionment. Columbia reported, and the Commonwealth accepted, as the value of its Pennsylvania assets the amount of $83,064,877, which multiplied by the rate produced a tax, before credit, of $276,882.92. The Commonwealth computed the credit for excise tax paid by Manufacturer’s Light and Heat Company by applying thereto the ratio of the "value of that company’s Pennsylvania assets to the value of its total assets. That ratio being 57.1593521 per cent, and the excise tax theretofore paid by Manufacturer’s being $150,000, the credit allowed was in the amount of $85,739.
Columbia contends that Section 1002(3) of the Excise Tax on Foreign Corporations, 72 P.S. §8002(3) (Supp. 1974-1975), reading: “In arriving at the amount of tax diue under this Article, a taxpayer shall apportion the increase in capital by the use of the relevant formula applicable to the operations of the corporation as set forth in Section 401,” requires that the increase of its Pennsylvania assets should have been apportioned.
Section 401, 72 P,S. §7401 (Supp. 1974-1975) provides formulas for the division of business income of corporations whose entire business is not transacted within the Commonwealth. Subsection (2)i(a) of Section 401 provides formulas for corporations other than railroad, truck, bus or airline companies covered by Subsection (2) (b), and pipeline or natural gas companies dealt with in Subsection (2) (c), and water transportation companies provided for by Subsection (2) (d). The formula of Subsection (2)>(c) applying to natural gas companies, provides that their business income should be apportioned by multiplying their entire business income by a fraction, the numerator of which is the cubic feet capacity of the *547 taxpayers’ pipelines in this Commonwealth and the denominator of which is the cubic feet capacity of the taxpayers’ pipelines everywhere. Columbia contends that Subsection 3 of Section 1002 requires that the fraction just mentioned applicable to its pipelines (12.2392%) be applied to the value of its assets wholly in Pennsylvania ($83,064,877), thus producing a tax in the amount of $33,888.22.
The Commonwealth contends that the formula of Section 401 is not to be applied to the assets admittedly located within Pennsylvania because the application of the fraction (here about 12%) to the value of those assets would result in a tax of less than one-third of one per cent upon the amount of increase of capital actually employed within the Commonwealth imposed by the first provisions of Section 1002, 72 P.S. §8002 (Supp. 1974-1975) .[8] The Commonwealth contends that the formula of Section 401 (2) (c) is relevant only to the apportionment of Columbia’s natural gas used both within and without the Commonwealth, which it refers to as “migratory capital.” We agree with the Commonwealth’s construction.
Columbia’s contention that only 12% of its property actually employed within the Commonwealth is subjected to the tax is inconsistent with the imposition of the tax on all property actually employed within the Commonwealth. We simply do not believe that the Legislature in rewriting the Excise Tax on Foreign Corporations intended to so drastically alter the rates and consequences of a tax which had been on the books in its present form for upwards of twenty years, and a reading of Section 1002 in its entirety reveals that it did not do so. The phrase “capital actually employed within the Common *548 wealth” is used no less than six times in the few short paragraphs of Sections 1001 and 1002 in referring to that which is taxed by Article X. Significantly, Subsecfion 1002(3) on which the appellant taxpayer depends refers only to “increase in capital” as the subject for apportionment by the use of relevant formula of Section 401. The tax is therefore an increase of all capital actually located within Pennsylvania but requires apportionment of the increase of capital which is employed both within and without the State, in the case of natural gas companies the apportionment of the increase of natural gas passing through the State by the cubic feet of pipeline formula of 401(2) (c). We note that Section 401 (2). (a) applicable to the usual multi-state business corporation requires apportionment of rentals of personal property within and without the State on the basis of days used within and without the State. Surely it could not be sensibly contended that Section 1002(3)' requires all of the capital of a corporation having such property so used employed within Pennsylvania should be apportioned by use of the formula relevant only to one kind of capital.
The Commonwealth concedes that Columbia’s natural gas is employed both within and without the Commonwealth and that this asset is “relevant” subject to the apportionment provided by Section 1002(3). It explains its failure to apply the admittedly relevant formula to Columbia’s natural gas in the course of movement through, into or out of Pennsylvania, valued at $6,263,094, because the taxpayer did not segregate or exclude this asset in its return. To the contrary, Columbia did indeed segregate this asset in its return and we learn from the stipulation that the asset “gas in the field” is gas passing through Pennsylvania in the course of interstate commerce — exactly that kind of asset which the Commonwealth concedes should be apportioned. Since the matter *549 is before us after trial de novo, we will fashion our judgment herein so as to give effect to that apportionment.
Columbia argues further that the credit provided by the excise tax on foreign corporations was improperly computed because Manufacturer’s total assets, were used as the denominator of the fraction applied to the $150,000 in domestic excise tax previously paid. The taxpayer argues that since the tax is on property actually employed within Pennsylvania the Legislature did not intend that total assets should be used for any purpose, including computation of the credit. Since the statute clearly describes the denominator as the total assets of the merged domestic corporation, the point of the appellant’s argument escapes us. We see no reason why the Commonwealth may not use total assets in the computation of a credit against a tax solely on property actually located within Pennsylvania.
We therefore compute Columbia’s Excise Tax on Foreign Corporations as follows:
Amount of capital actually employed within Pennsylvania, including natural gas 83,064,877
Less value of natural gas . 6,263,094
Increase of capital, except gas .................... 76,801,783
Tax at .0033 ............ $253,445.88
Value of natural gas..... 6,263,094
% of cubic feet of pipeline in Pennsylvania......... .122392
Taxable value of natural gas .................... 766,552.60
Tax at .0033 on natural gas 2529.62
Total tax before credit . .. 255,975.50
Less credit ............. 85,739.00
Net tax due $170,236.50
*550 Order
And now, this 6th day of June, 1975, the appeal of Columbia Gas Transportation is sustained to the extent set forth in our opinion, and the settlement made by the Department of Revenue is disapproved to the same extent; unless exceptions are filed within thirty (30) days of the filing of this order, the Chief Clerk is directed to enter judgment in favor of the Commonwealth in the amount of $170,236.50, which amount having been paid,[9] said judgment shall be marked satisfied, and a credit of $20,630.44 entered on the records of the Department of Revenue.

. Since Columbia does not press in argument that its Foreign Excise Tax should be ascertained in this fashion or that it should be in the amount of $8,056.82, the relevance of the stipulation on which this finding is based escapes us. The tax is imposed on the increase of a foreign corporation’s capital actually employed within Pennsylvania, however acquired.

. When first enacted Article X was headed “Capital Stock Tax on Foreign Corporations.” The heading was amended to its present form by Section 3 of the Act of Sept. 9, 1971, P.L. 437.

. Section 8, in addition to repealing the Act in question, provided that it should remain in effect for three years as to tax for any period prior to the effective date of the Act of July 12, 1972 and continue in effect thereafter as to pending proceedings for imposition and collection.

. Formerly the Act of July 25, 1953, P.L. 560, formerly at 72 P.S. §§1861 to 1867, repealed by Section 1005 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, 72 P.S. §8005 (Supp. 1974-1975) and replaced by Article X of the latter Act.

. The Excise Tax on Foreign Corporations has been described as a tax on tangible property. Commonwealth v. Goldman Theatres, Inc., 62 Dauphin 256 (1952). Among its many other arguments, made in the case, Columbia contends that the value of its natural gas in Pennsylvania should not have been included in the tax computations because gas, not being capable of being touched, is not tangible property. This contention is rejected. Anything which is able to be perceived as materially existent is tangible. Intangible properties in the law are such incorporeal rights as shares of capital stock, choses in action, copyrights and the like.

. “The Congress shall have the power... to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.”

. In particular, Ozark Pipeline Corp. v. Monier, 266 U.S. 555 (1925).

. Neither party contends that the fraction based on cubic feet of pipeline within and without Pennsylvania should be applied to Columbia’s total increase in capital wherever located.

. Columbia paid $190,866.94 with its return.