705 So.2d 584 (1997)
DEPARTMENT OF TRANSPORTATION, STATE OF FLORIDA, Appellant/Cross-Appellee,
v.
Clarence ROGERS, et al., Appellees/Cross-Appellants.
No. 96-430.
District Court of Appeal of Florida, Fifth District.
November 14, 1997.
As Revised on Grant of Clarification and Denial of Rehearing February 13, 1998.
*585 Pamela S. Leslie and Thornton J. Williams, General Counsels, and Gregory G. Costas, Assistant General Counsel, Tallahassee, for Appellant/Cross-Appellee Department of Transportation.
Marcia K. Lippincott of Marcia K. Lippincott, P.A., Maitland, and Dominick J. Salfi of Law Offices of Dominick J. Salfi, P.A., Maitland, for Appellee/Cross-Appellant Gus Boulis.
Edgar M. Dunn, Jr., P.A., and Suzanne A. Novak of Dunn, Abraham & Swain, Daytona Beach, for Appellee/Cross-Appellant Subway U.S.A.-1, Inc.
W. SHARP, Judge.
The Department of Transportation ("DOT") appeals from a final judgment in an eminent domain proceeding, in which the jury valued the property taken at $705,000.00 *586 We reverse because we find the evidence adduced at trial does not support the award, and because the trial court erred in admitting over objection, the testimony of a business valuation expert which was based on projected lost profits of a business being conducted on the property.
In this case the DOT condemned the whole property. The property was located at 900 Ballough Road in Daytona Beach. The property size was 13,000 square feet, which consisted of a 30-year-old building, and 20 parking spaces.[1] Boulis owned the property, and he rented it to Subway USA-I, Inc., a corporation primarily owned by Tutero. Tutero was operating a Subway Restaurant on the property at the time of the condemnation proceeding.
Tutero's lease expired in December of 1994, but a dispute over a rent escalation clause in 1992 resulted in litigation. In February 1994, the dispute was settled and Boulis and Tutero executed a new lease in which they agreed Tutero would pay Boulis $5,000.00 per month in rent, an increase from $3,000. The lease also provided that in the event of a taking, Subway would get the first $125,000 and thereafter he and Boulis would equally split the balance of the award. By separate agreement, the parties provided that Tutero would not have to pay the $5,000.00 rent payment until February 1, 1995. The taking occurred a year later on January 24, 1995.
After a jury trial, the jury awarded appellees the sum of $705,000.00. A written request for an advisory breakdown of this sum was presented to the jury. It recommended a breakdown which gave Tutero $145,000 and Boulis $560,000. There is no explanation for this breakdown in the record, but the court awarded the parties these amounts in the final judgment, which is similarly without any findings.
DOT contends that the testimony of a business valuation expert, Zwebber, was erroneously admitted. We agree. At trial, Zwebber stated that he was responsible for "the analysis and the valuation of businesses, fractional interests in businesses, and intangible assets." He categorized himself as a "business appraiser," and stated that part of what he did every day was to look at "intangible rights or intangible assets." He employed a residual methodology, which may be used to value any intangible asset. The analysis focuses on total sales, and the technique involves projection of income into the future. The revenue projected here would have come from future sales of submarine sandwiches. The projections were based upon what the company did historically and what is going on in the industry. Zwebber's report involved an estimate of future revenues over a 15year period of time, and included population projections. It was based on the specific Subway business operating on the specific property. He testified it was not the real estate. Had he done a valuation with Burger King on the same property, instead of a Subway, the valuation would be different.
Zwebber stated that the methodologies about which he testified were used in the appraisal of real estate in income capitalization[2] approach methods. And he explained:
Simplistically what we have done is we've looked at the operation at the Seabreeze Circle, and we're somewhere $575,000 a year in sales. And we looked at what the average Subway store in the central Florida *587 region does in sales. It does somewhere around $350,000.
* * * * * *
What we have done is said that based upon the history of the Seabreeze location, we're going to try to project sales over this 14-year period. So we do a projection of sales that may look like that. We've also looked at the historical growth of the average Subway store, and we've done a projection of their sales.
And what we have done in our approach is we've said, we've looked at this increment here, the difference between what we do and what the average store does, and its our contention, its our opinion, that difference in sales is attributable to the location. Because as we'll see later, everything else is the same about these stores.... The only conceivable difference between our store and the average store is the location.
Full compensation in eminent domain matters consists of two elements: the value of the property taken, and severance damages to the remainder, if any, in a partial taking. Mulkey v. Division of Administration, 448 So.2d 1062 (Fla. 2d DCA 1984). Florida law provides that a lessee is entitled to be compensated for his lease interest in eminent domain proceedings, and to share proportionately in the settlement for the value of the taken leasehold. Carter v. State Road Department, 189 So.2d 793 (Fla.1966); Dama v. Record Bar, Inc., 512 So.2d 206 (Fla. 1st DCA), rev. denied, 519 So.2d 988 (Fla.1987); Mulkey.
However, business damages are recoverable only where a partial taking occurs, a situation not present here. § 73.071(3)(b), Fla. Stat. (1995); State Road Dept. v. Bramlett, 189 So.2d 481 (Fla.1966). The right to recover this type of damage is strictly a creature of statute, and such right did not exist at common law. Carter. Such damages are given as a matter of legislative grace and are not a constitutional imperative. Behm v. DOT, 383 So.2d 216 (Fla.1980); Trinity Temple Church of God in Christ v. Orange County, 681 So.2d 765 (Fla. 5th DCA 1996), rev. denied, 689 So.2d 1073 (Fla.1997); Mulkey. Such laws are strictly construed in favor of the state, id; and the damages are statutory largess. City of Tallahassee v. Boyd, 616 So.2d 1000 (Fla. 1st DCA 1993), approved, 647 So.2d 819 (Fla.1994). Neither business damages nor lost profits are part of the constitutionally protected "just" or "full" compensation requirement since they are part of intangibles[3] which are not property in the constitutional sense. Behm; Broward County v. Carney, 586 So.2d 425 (Fla. 4th DCA 1991).
We are called upon here to determine whether the substance of Zwebber's testimony constitutes "business damages," which are precluded in whole taking cases. Florida cases which describe the nature of business damages in partial taking cases are instructive in analyzing this issue, because business damages are not defined in §§ 73.071(3)(b).
Business damages are in the nature of lost profits attributable to the reduced profit-making capacity of the business caused by a taking of the realty. DOT v. Murray, 670 So.2d 977, 979 (Fla. 1st DCA), quashed other grounds, 687 So.2d 825 (Fla. 1997). See also LeSuer v. State Road Dept., 231 So.2d 265, 268 (Fla. 1st DCA 1970). They are, however, not limited to lost profits[4] and may include, inter alia, loss of good *588 will, Murray, Matthews v. DOT, 324 So.2d 664, 668 (Fla. 4th DCA 1975). The Florida Supreme Court has described business damages in eminent domain cases as lost profits attributable to the reduced profit-making capacity of the business caused by the taking. City of Tallahassee. This was precisely the nature of Zwebber's testimony.
Appellees argue that Zwebber's testimony was properly admitted based upon a fairness concept of just compensation, and they attempt to distinguish Zwebber's testimony from business damages. They argue that Zwebber testified to the value of the leasehold interest,[5] and utilize various terms for this loss, including: intangibles; (parcel specific) goodwill;[6] "location benefits"; and otherwise refer to the valuation as "investment value."[7]
The language utilized to describe Zwebber's testimony and the testimony of Zwebber himself, indicate that what is being described is de facto business damage. Zwebber testified that his entire valuation was based on revenues, income and profit from the Subway located at that particular location, as compared to that of an average Subway. Zwebber gave no testimony which directly related to the property (i.e, the lease itself), save for the "location," as it affected profitability. The losses or value in question were directly related to revenues, income and profit. The substance of Zwebber's testimony was the valuation of the business and damages flowing therefrom; i.e., lost profits or revenue attributable to an alleged reduced profit making capacity of the restaurant at a different location. This fits the definition of business damages. See City of Tallahassee. They are not recoverable in whole taking cases. Bramlett. Hence, the admission of Zwebber's testimony was reversible error. See Murray.
However, even if Zwebber's testimony were admissible, there was insufficient evidence to support the amount awarded. 4444 Corp. v. City of Orlando, 598 So.2d 287 (Fla. 5th DCA 1992); Balbier v. City of Deerfield Beach, 408 So.2d 764 (Fla. 4th DCA 1982). Five appraisers testified at the trial: two for DOT (Deighn and Velie); and three for the appellees (Cline and Chavoustie, who testified for Boulis, and Zwebber who testified for Tutero). DOT's appraisers valued the property at approximately $314,000. Cline, who was unlicensed, testified that the value of the property (lot alone) was $450,000. Chavoustie, who was licensed, gave no dollar amount for the total value. Zwebber, the business valuation expert, testified that the value of the leasehold (i.e., Tutero's right to operate a business at that location) was $380,000. There was other testimony that to *589 replace the existing building as is, brand new, would cost $181,000. None of these figures in any combination supports the amount awarded.
REVERSED AND REMANDED.
GOSHORN and ANTOON, JJ., concur.
NOTES
[1] The property had numerous "negatives." In addition to its age, it was in need of repair. It had good traffic, but not extraordinary traffic, with a minimal chance of increased traffic (due to the then existing old bridge). It was not located on a major street and it was located in a high crime area. The property was small in size (approximately 13,000 square feet compared to an average McDonald's property of 43,000 square feet). There was limited parking and the restrooms were accessible only from the outside. There was traffic congestion at the property's location, and a problem with left in/out turns (due to a traffic circle). The property was grossing $540,000 per year, but the building could be built brand new (as it was then) for $181,000.
[2] The income capitalization method is used in partial taking cases. Rice v. Fort Lauderdale, 281 So.2d 36, 40 (Fla. 4th DCA 1973), cert. denied, 289 So.2d 735 (Fla.1974), affirmed in part, reversed in part, 313 So.2d 649 (Fla.1975)(lower court should have admitted both lease and capitalized value of the lease at the time of the taking).
[3] Intangible property has been defined as incorporeal rights, as shares of capital stock, chooses in action, copyrights and the like. Columbia Gas Transmission Corp. v. Com., 19 Pa.Cmwlth. 523, 339 A.2d 912 (Pa.Cmwlth.1975), reversed other grounds, 468 Pa. 145, 360 A.2d 592 (Pa.1976). Intangible rights can arise from a contract. See Jones v. H.D. & J.K. Crosswell, 60 F.2d 827, 828 (4th Cir.1932). Intangible property rights are a group of rights inhering in a person's relation to a physical thing, as a right to possess and use. Washington Legal Foundation v. Mass. Bar Foundation, 993 F.2d 962, 973 (1st Cir.1993).
[4] The term "lost profits" signifies the difference between gross income and costs or expenses which had to be expended to produce the income. Cromartie v. Carteret Sav. & Loan, 277 N.J.Super. 88, 649 A.2d 76, 83 (A.D.1994). And they are established by proving income and expenses. Born v. Goldstein, 450 So.2d 262 (Fla. 5th DCA 1984); Polyglycoat Corp. v. Hirsch Distributors, 442 So.2d 958 (Fla. 4th DCA 1983).
[5] In Trump Enterprises, Inc. v. Publix Supermarkets, Inc., 682 So.2d 168 (Fla. 4th DCA 1996), rev. denied, 692 So.2d 185 (Fla.1997), the court held that the lessee could receive compensation for the decrease of its leasehold interest, and found that the business' continued profitability could not be factored into the valuation.
[6] The term goodwill has been defined as an intangible asset that cannot be separated from the tangible asset. Marriage of Monaghan, 78 Wash. App. 918, 899 P.2d 841, 845 (1995); In re Fitch Bankruptcy, 174 B.R. 96, 103 (Bankr.S.D.Ill. 1994). It represents the expectation of continued public patronage. Monaghan. It inheres to the value of a going business. H & H Prod., Inc. v. Hughes, 498 P.2d 965, 967 (Colo.App.1972). Goodwill is an element responsible for the profit of a business. Jackson v. Caldwell, 18 Utah 2d 81, 415 P.2d 667, 670 (Utah 1966). And it is all that goes with a business in excess of its mere capital and physical value. Taylor v. Taylor, 222 Neb. 721, 386 N.W.2d 851, 856 (1986); Glosband v. Watts Detective Agency, Inc. 21 B.R. 963, 975 (D.C.Mass.1981). The chief elements of goodwill are community of place and community of time, with patronage that attaches to the name and location. Avery v. City of Lyons, 183 Kan. 611, 331 P.2d 906, 914(1958).
[7] Appellees also cite to Orange State Oil Co. v. Jacksonville Expressway Authority, 110 So.2d 687 (Fla. 1st DCA), cert. denied, 114 So.2d 4 (Fla. 1959), in which the market value approach was found to be inherently inadequate to value a leasehold interest in an eminent domain proceeding. However, this case is distinguishable by its facts. Orange State did not involve lost profits, goodwill, loss of intangibles, etc., but rather it involved exclusion of evidence by an expert witness on the value of the leasehold. The court found that although the summation method, and fair market value are generally appropriate in determining the value of a leasehold, the lessee in that case had expended sums for improvements to the realty, which by the terms of the lease became the property of the fee owner. Under those circumstances, the fair market value was insufficient to value the lessee's interest.