823 A.2d 108

The **PHILADELPHIA EAGLES FOOTBALL CLUB, INC.,** Appellant,

v.

**CITY OF PHILADELPHIA,** Appellee.

Supreme Court of Pennsylvania.

Resubmitted March 7, 2003.

Decided April 25, 2003.

Reargument Denied June 9, 2003.

190

194

Dan Aaron Schulder, Joseph C. Bright, Philadelphia, Kevin Jon Moody, Harrisburg, for The Philadelphia Eagles Football Club, Inc.

Joseph Anthony Sullivan, Jonathan Steven Liss, Stewart M. Weintraub, for Pennsylvania Chamber of Business and Industry Amicus Curiae.

Lee Allen Zoeller, Philadelphia, for Committee on State Taxation.

Frank Paiva, for City of Philadelphia.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NIGRO.

Appellant, the Philadelphia Eagles Football Club, Inc. ("Football Club"), seeks relief from assessment of the Business Privilege Tax ("BPT") imposed by Appellee, the City of Philadelphia ("City"). We agree with the Commonwealth Court below that the Football Club's media receipts arising from the television broadcast of football games were subject to the BPT as copyright royalties for the licensing of a property right. We disagree, however, with the Commonwealth Court

that the City's failure to apportion the Football Club's media receipts did not violate the Commerce Clause of the United States Constitution and therefore, disagree with the court's conclusion that the City could properly tax 100% of the Football Club's media receipts when calculating the Football Club's BPT liability. Accordingly, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

The First Class City Business Tax Reform Act [1] grants the City authority to levy and collect an annual tax on the taxable receipts of businesses operating within its city limits. *See* 53 P.S. §§ 16183, 16184. Pursuant to that authority, the City enacted Chapter 19–2600 of the Philadelphia Code ("Code") to implement a BPT beginning in 1985.[2] The BPT is imposed upon the gross receipts and net income of "every person engaging in any business in the City of Philadelphia." Philadelphia Code § 19–2603(1). For purposes of determining whether one is liable for paying the BPT, a "person" is "[a]ny individual, partnership, limited partnership, association, corporation, estate or trust." "Business" means carrying on or exercising for gain or profit within Philadelphia any trade, business, financial business, profession, vocation, or commercial activity, or making sales within the city. *Id.* § 19–2601.[3]

1. Act of May 30, 1984, P.L. 345, No. 69, *as amended*, 53 P.S. §§ 16181–16193.

2. The BPT succeeded both the General Business Tax and the Mercantile License Tax in Philadelphia. The Code incorporated essentially identical provisions as those contained in the Tax Reform Act, and the City subsequently enacted additional provisions and amendments pursuant to its authority under the Tax Reform Act. *See* 53 P.S. §§ 16183, 16184; Philadelphia Code §§ 19–2601—19–2608.

3. Section 19–2603(3) of the Code further delineates the individuals and entities subject to the BPT, providing that:

Any person having an active presence in the City is subject to the [BPT]. Any activity within the City by a person, through one or more employees, agents or independent contractors, that makes possible the creation, realization or continuance of contractual relationships between the person and customers located within the City, including but not limited to, the solicitation within the City by a person, through one or more employees, agents, or independent contractors, is sufficient to constitute active presence in the City. Physical pres-

The BPT is composed of two separate components, gross receipts and net income, which are calculated independently. Only the gross receipts component of the BPT is involved in the instant appeal. In relevant part, the Code defines "receipts" as:

> Cash, credits, property of any kind or nature, received from conducting any business or by reason of any sale made, including resales of goods, wares or merchandise taken by a dealer as a trade-in or as part payment for other goods, wares or merchandise or services rendered or commercial or business transactions, without deduction therefrom on account of the cost of property sold, materials used, labor, service or other cost, interest or discount paid or any other expense. [Specific provisions for taxpayers involved in the business of insurance.] Receipts of any business shall exclude: [listing eleven separate exclusions, which are not relevant here].

*Id.* § 19–2601.[4] In addition, the City's Department of Revenue has promulgated extensive regulations regarding all as-

ence (the maintenance of an office or property) in the City is not required to establish active presence in the City.
Philadelphia Code § 19–2603(3).

**4.** Although the net income component of the BPT is not directly at issue here, gross receipts are one of the measurements of the three-factor formula used to apportion income to Philadelphia for the net income component of the BPT. *See* BPT Regulations § 408 (setting forth formula based on taxpayer's property, payroll and receipts within and outside of Philadelphia). The gross receipts calculation may therefore implicate the net income component of the BPT. *See id.* § 408(3). With that in mind, we note that the Code requires a taxpayer to make an irrevocable election with respect to the method of calculating net income, and provides for the allocation and apportionment of net income. The Code's definition of "net income" provides in relevant part:

(a) "Net income" shall, at the option of the taxpayer, which option shall not be revokable [sic] by the taxpayer after it has been exercised as provided for by the collector, be either:
(1) The net gain from the operation of a business, after provision for all allowable costs and expenses actually incurred in the conduct thereof, either paid or accrued in accordance with the accounting system used, without deduction of taxes based on income; or

pects of the BPT, including the following provision governing taxation of copyright royalties:

> where a taxpayer, whether a domestic or foreign corporation or any other type of business entity, maintains its commercial domicile in Philadelphia, all patent, copyright and trademark royalties received are to be included in the measure of tax unless attributable to business conducted at a place of business regularly maintained by the taxpayer outside of Philadelphia.

City of Philadelphia Business Privilege Tax Regulations § 322.

During all the tax years relevant to the instant appeal, the Football Club, a Delaware corporation with its principal place of business located in Philadelphia, owned and operated the Philadelphia Eagles football team ("Eagles Team"). The Football Club was a member of the National Football League ("NFL"), an unincorporated, non-profit association of member clubs that own and operate professional football teams. As a

(2) The taxable income from any business activity as returned to and ascertained by the Federal Government prior to giving effect to the exclusion for dividends received and net operating loss, subject to [various deductions and adjustments].

(b) In the case of a corporation participating in the filing of a consolidated corporate return to the Federal Government, net income shall mean the income from any business activity which would have been returned to and ascertained by the Federal Government, subject, however to any correction thereof for fraud, evasion or error as finally ascertained by the Federal Government. . . .

(c) The collector shall establish rules and regulations and methods of apportionment and allocation and evaluation so that only that part of such net income or net operating loss which is properly attributable and allocable to the doing of business in [the City] shall be taxed hereunder. The collector may make an apportionment and allocation with due regard to the nature of the business concerned on the basis of mileage, the ratio of the taxable receipts of the taxpayer from within the city to the total receipts of the taxpayer, the ratio of the value of the tangible personal and real property owned or leased and situated in the city levying the tax to the total tangible personal and real property of the taxpayer wherever owned and situated, the ratio of the wages, salaries, commissions and other compensation paid by the taxpayer within the city levying the tax to the total wages, salaries, commissions and other compensation paid by the taxpayer, and any other method or methods of apportionment and allocation other than the foregoing, calculated to effect a fair and proper apportionment and allocation.

Philadelphia Code § 19–2601.

member of the NFL, the Football Club shared in a percentage of the revenues received by the NFL from its contracts with major television networks ("Network Contracts") for the right to televise NFL football games.[5] Under the Network Contracts, the networks had the exclusive right to broadcast the live telecasts of NFL football games, and the NFL received payments from the networks, referred to as media receipts, which were divided evenly among the NFL teams.[6] During the tax years in question, the NFL had twenty-eight teams, so

**5.** Historically, the NFL has entered into arrangements with several networks for the telecast of different "packages" of NFL games. *See* N.T., Philadelphia Tax Review Board Hearing, 7/11/96, R.R, vol. 1, at 426a. For example, one network broadcasts Sunday afternoon games played by teams in the American Football Conference (the NFL is divided into the American Football Conference and the National Football Conference), another network broadcasts Sunday afternoon National Football Conference games, while other networks broadcast games played at night, including Monday Night Football. *See* Note, *The DirectTV NFL Sunday Ticket: An Economic Plea for Antitrust Law Immunity*, 79 Wash. U.L.Q. 287, 287–89 (Spring 2001) (discussing NFL's contracts with various networks, and the exclusive rights to televise specific games). Under the most recent NFL broadcasting deal, the NFL signed four separate contracts with four separate networks, under which each network received exclusive rights to televise a specific package of NFL games over an eight-year period (1998–2006), in return for which the networks will pay the NFL a total of approximately eighteen billion dollars.

**6.** The Reproduced Record on appeal here contains a single contract between the NFL and the NBC television network, which represents all of the Network Contracts involved in this matter. *See* NFL/NBC Contract, 2/14/91, R.R., vol. 2, at 782a–808a. At hearings before the Philadelphia Tax Review Board, the parties agreed that the NFL/NBC Contract was like a "master contract," with the provisions of all contracts being "virtually the same," the relevant difference being the specific financial/payment provisions, which were attached as schedules to each contract. N.T., 6/27/96, R.R., vol. 1, at 327a–329a; *see* N.T., 7/11/96, R.R., vol. 1, at 425a–426a (NFL vice-president of broadcasting testifying that contract with various networks were similar); *see, e.g., Detroit Lions, Inc. v. Department of Treasury*, 157 Mich.App. 207, 403 N.W.2d 812, 816–17 (1986) (court quotes and cites a 1982 contact between the NFL and a network, which mirrors the language of the contract in the record here). The NFL/NBC Contract was part of the record below, and the Commonwealth Court, Court of Common Pleas and the Board relied upon it in rendering their decisions. Thus, while specific cites in this opinion are to the NFL/NBC Contract in the record, such citations refer to the same provisions in all the Network Contracts, and such provisions apply to all the Network Contracts relevant to this appeal.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇

each team received one twenty-eighth of the media receipts. The Eagles Team played one-half of its games in Philadelphia and the other half at other teams' venues around the country. Pursuant to the Network Contracts, all of the Eagles Team's games were televised.

▇▇ The Football Club filed timely BPT tax returns for the tax years 1986 through 1994 and paid the BPT in accordance with those filings. The City audited the Football Club for tax years 1986 through 1992, and issued a notice of assessment on April 22, 1994. In response to the City's audit assessment of the BPT, on June 3, 1994, the Football Club filed a Review Petition with the Philadelphia Tax Review Board ("Board"), seeking relief from the City's assessments of the BPT, which totaled $730,705.39 for the years 1986 through 1992.[7] The Football Club subsequently filed a Refund Petition with the Board on October 5, 1994, seeking a refund of $250,197.00 in BPT taxes that it had paid for the years 1986 through 1992. The Football Club claimed an overpayment of BPT taxes due to the erroneous calculation of the percentage of the media receipts that should have been included in its gross receipts for purposes of calculating its BPT liability. Specifically, the Football Club argued that only 50% of the media receipts, rather than 100% of the media receipts, should have been subject to the BPT calculations because only half of the Eagles Team's football games were played in and broadcast from Philadelphia. The Board held hearings on the Football Club's petitions from December 14, 1995 to September 24,

7. Although the actual taxation rates for the BPT are not directly relevant to the instant appeal, to facilitate a basic understanding of the overall tax scheme, we note that for the tax year 2002, the "gross receipts" portion of the BPT is imposed at an annual rate of 2.4 mills on each dollar of the taxpayer's annual taxable receipts, and the "net income" portion of the BPT is imposed at the rate of 6.5% of the taxpayer's taxable net income. *See* Philadelphia Code § 19–2604(2)(k). As to the instant case, the following tax rates were in effect during the tax years in question: 1986–88, 3.9 mills per dollar of gross receipts and 4.35% of net income; 1989–92, 3.25 mills per dollar of gross receipts and 6.5% of net income. *See id.* § 19–2604(b), 2604(c) & 2604(d); Football Club's 1992 BPT Tax Return (BPT Form 598), R.R., vol. 2, at 827a–830a.

1996.[8]

In a decision dated December 3, 1997, the Board denied the Football Club's Refund Petition and granted in part and denied in part the Football Club's Review Petition. The Board agreed with the Football Club that only one-half of the Football Club's media receipts should be included in gross receipts for purposes of assessing the BPT. The Board determined that the media receipts constituted fees for services rendered, i.e., fees for the playing of football games by the Eagles Team. Because the Eagles Team played one-half of its football games in Philadelphia and one-half of its games in other cities, the Board concluded that one-half of the Football Club's media receipts were subject to the BPT as fees for services rendered in Philadelphia.[9]

The Football Club filed an appeal with the Court of Common Pleas of Philadelphia County on December 15, 1997. The next day, the City filed a cross appeal.[10] Following oral argument on the appeals, on December 31, 1998, the Court of Common Pleas reversed in part and affirmed in part the decision of the Board. Specifically, the Court of Common Pleas reversed the Board's conclusion that the Football Club's

**8.** The Football Club also sought relief for assessments of the Philadelphia City Wage Tax imposed upon Norman Braman, who owned and operated the Football Club during all the tax years relevant to the instant appeal. The Football Club further sought abatement relief for the imposition of interest and penalties. This Court granted allocatur limited to the issues addressed herein and therefore, issues regarding the Wage Tax, interest and penalties are not subject to review here. *See Philadelphia Eagles Football Club, Inc. v. City of Philadelphia,* 564 Pa. 472, 769 A.2d 443 (2001) (per curiam).

**9.** Under the Code, receipts or portions of receipts received for any services actually performed outside the Philadelphia city limits are excluded from the BPT, as long as the services are not rendered outside the city in order to evade or avoid payment of the BPT. Philadelphia Code § 19–2601. Taxable receipts of persons making sales or rendering services both inside and outside the Philadelphia city limits are to be segregated for purposes of the imposition of the BPT. *Id.*

**10.** The City's cross appeal involved the deductibility of Mr. Braman's aircraft expenses used for personal business and the computation of the time Mr. Braman spent in Philadelphia for Wage Tax purposes. Given the limited grant of review in the instant case, the claims raised in the City's cross appeal are not at issue here.

media receipts were fees for services rendered, and instead, found as a matter of law that those receipts were copyright royalties resulting from the licensing of a property right. The court further concluded that 100% of those copyright royalties were subject to the BPT under Section 322 of the BPT Regulations, which, as indicated above, allocates all copyright royalties to the City if the taxpayer's commercial domicile is in Philadelphia. The Court of Common Pleas affirmed the Board's decision in all other respects.

Both the Football Club and the City appealed from the decision of the common pleas court, and the Commonwealth Court subsequently consolidated the appeals. On July 26, 2000, a five-member panel of the Commonwealth Court unanimously affirmed the order of the Court of Common Pleas. *See Philadelphia Eagles Football Club, Inc. v. City of Philadelphia*, 758 A.2d 236 (Pa.Commw.2000). In doing so, the Commonwealth Court held that the Football Club's gross media receipts from the television broadcast of the Eagles Team's football games were copyright royalties subject to the BPT. The Commonwealth Court further concluded that the City did not violate the Commerce Clause of the U.S. Constitution by failing to apportion the media receipts to account for football games played outside of Philadelphia. According to the Commonwealth Court, because income from copyright royalties is properly allocated to the domiciliary situs of the taxpayer, and because the Football Club was commercially domiciled in Philadelphia, 100% of the media receipts were subject to taxation by the City under the gross receipts portion of the BPT. The Football Club subsequently filed a Petition for Allowance of Appeal to this Court raising a total of four issues.

We granted allocatur to consider two issues: 1) whether the Commonwealth Court erred in concluding that the Football Club's media receipts arising from the television broadcast of footballs games pursuant to the Network Contracts were copyright royalties subject to the BPT; and 2) whether the Commonwealth Court erred in holding that the City was not required to apportion the Football Club's media

receipts in assessing the BPT in order to comply with the Commerce Clause of the U.S. Constitution.[11]

## II. MEDIA RECEIPTS

On appeal here, the Football Club claims that the Commonwealth Court erred in reversing the Board's determination that the media receipts paid pursuant to the Network Contracts were fees for services rendered, and instead concluding that because the Network Contracts describe the transfer of exclusive television broadcast rights in exchange for rights payments, the media receipts were subject to the BPT as copyright royalties from the licensing of a property right. We disagree.

A. *Networks Paid Media Receipts in Exchange for an Exclusive Right*

The Football Club first argues that the networks paid it the media receipts in exchange for the playing of football games by the Eagles Team, i.e., the media receipts were fees for services rendered. The Football Club maintains that the networks controlled the entire structure of NFL football games, and that the NFL was (and still is) geared toward providing a live entertainment service to the networks. According to the Football Club, because the Network Contracts were structured around the NFL teams providing a service to the networks that was live and was broadcast only once, the media receipts were taxable as fees for services rendered.

Contrary to the Football Club's assertions, however, Congress has long recognized that what the television networks broadcasting NFL football games pay NFL league members for is the exclusive right to telecast the games live, and not for the actual playing of the football games. In 1961, the NFL

11. Our standard of review in a tax appeal where, as here, the court of common pleas took no additional evidence, is limited to determining whether constitutional rights were violated, an error of law was committed, or the Board's findings of fact were supported by substantial evidence. 2 Pa.C.S. § 754(b). As with all questions of law, this Court's scope of review is plenary. *Ramich v. Worker's Compensation Appeal Bd. (Schatz Electric, Inc.)*, 564 Pa.656, 770 A.2d 318, 321 (2001).

successfully lobbied Congress to provide an exemption from antitrust laws in order to allow the NFL to pool and sell the broadcasting rights of its member teams, resulting in the enactment of the Sports Broadcasting Act ("SBA").[12] The SBA provides that antitrust laws "shall not apply to any joint agreements by or among persons engaging in or conducting the organized professional team sports of football ... by which any league of clubs ... sells or otherwise transfers *all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football* ... engaged in or conducted by such clubs."[13] 15 U.S.C. § 1291 (emphasis added). In granting the NFL the ability to enter into pooled-rights agreements with the networks, Congress clearly stated that such agreements involve the transfer of exclusive broadcasting rights from the NFL members to the networks.

Federal courts examining broadcasting contracts between the NFL and the networks have also consistently concluded that such contracts involve the sale or transfer of exclusive rights to televise games. *See, e.g., Shaw v. Dallas Cowboys Football Club, Ltd.,* 172 F.3d 299 (3d Cir.1999); *United States Football League v. National Football League,* 842 F.2d 1335 (2d. Cir.1988) *National Football League v. McBee & Bruno's, Inc.,* 792 F.2d 726 (8th Cir.1986); *Mid–South Grizzlies v. National Football League,* 720 F.2d 772 (3d Cir.1983); *WTWV, Inc. v. National Football League,* 678 F.2d 142 (11th Cir.1982); *United States v. National Football League,* 196 F.Supp. 445 (E.D.Pa.1961). Courts in other states have reached the same conclusion. *See, e.g., Detroit Lions, Inc. v. Department of Treasury,* 157 Mich.App. 207, 403 N.W.2d 812

**12.** P.L. No. 87–331, § 1, 75 Stat. 732, *codified as amended,* 15 U.S.C. §§ 1291–1294. Prior to the enactment of the SBA, collective agreements between professional sports leagues and broadcast television providers were found to be horizontal agreements in violation of the Sherman Antitrust Act. *See United States v. National Football League,* 196 F.Supp. 445 (E.D.Pa.1961).

**13.** "Sponsored telecasting" under the SBA pertains only to network broadcast television (i.e., free television) and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks. *See* 15 U.S.C. § 1291; *Kingray, Inc. v. NBA, Inc.,* 188 F.Supp.2d 1177 (S.D.Cal.2002).

(1986); *Cincinnati Bengals, Inc. v. Papania,* 92 Ohio App.3d 785, 637 N.E.2d 330 (1993).[14] In contrast to the overwhelming consensus represented by these cases, the Football Club fails to cite one case to support its argument that the payments the NFL receives from the networks pursuant to a television contract constitute fees for services rendered.

The plain language of the Network Contracts also refutes the Football Club's argument. The Network Contracts clearly treat the arrangement between the parties as the transfer of the right to broadcast the live telecast of football games played by the NFL teams to the networks. Specifically, section 1 of the Network Contracts, entitled "Television Rights Transferred," gave the networks exclusive "over-the-air broadcast telecasting rights" to specific NFL games scheduled to be telecast. *See* NFL/NBC Contract, pp. 1–2, R.R., vol. 2, at 782a–783a. In return, the NFL received rights fees from the network, which were paid in periodic installments in accordance with an agreed upon schedule. *See id.,* p. 22, at 803a; *see also* Letter from NFL to NBC Network, 2/14/91, R.R., vol. 2, at 781a (in exchange for right to televise NFL games, network "will pay rights fees to the [NFL] member clubs"). Moreover, the Network Contracts specifically referred to the NFL member teams' "proprietary rights in each

---

**14.** Along with the courts, commentators have also recognized that NFL contracts with television networks for broadcast rights involve the sale of a property right. *See, e.g.,* Symposium, *Restructuring Professional Sports Leagues,* 12 Fordham Intell. Prop. Media & Ent. L.J. 413, 427 (Winter 2002) ("NFL has the ability to take the intellectual property associated with it and all of its clubs and package that for ... its television partners"); Gary R. Roberts, *The Legality of the Exclusive Collective Sale of Intellectual Property Rights by Sports Leagues,* 3 Va. J. Sports & Law 52, 52–59 (Spring 2001) (NFL teams collectively selling the right to televise games live involves the transfer of an intellectual property right); Stephen F. Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Professional Sports Leagues,* 52 Case W. Res. L.Rev. 133, 141–45 (Fall 2001) (NFL's contracts with networks involve collective sale of valuable intellectual property rights); Robert W. McChesney, *Media Made Sport: A History of Sports Coverage in the United States, in Media, Sports, and Society* 65 (Lawrence A. Wenner ed., 1989) ("successful management of professional sports leagues and franchises is based on the capacity to best exploit [television] rights payments").

game telecast." NFL/NBC Contract, p. 12, R.R., vol. 2, at 803a.

While we completely agree with the Football Club that the obligation to play football games was a necessary and crucial component of the Network Contracts, it nevertheless stands that simply playing the game was not enough for the Football Club to generate its right to payment of media receipts from the networks. Rather, the broadcast of the games was the crux of the contract, as evidenced by the fact that a football game only reached its true value by being telecast. The Football Club, as a member of the NFL, was only paid media receipts pursuant to the contractual provisions granting the networks the exclusive right to telecast the games.[15] The Network Contracts specifically provided that if for any reason beyond the network's control a game was played but was not telecast by the network, and no other NFL game telecast could be substituted, the media receipts due the NFL would be reduced by the network's out-of-pocket production costs and the advertising revenues that needed to be refunded in connection with the canceled telecast. *See id.,* p. 8, at 789a. Similarly, when a scheduled game was not played, the NFL was required to refund the payment of media receipts for that telecast when no other NFL games were available for substitute telecast and equivalent game telecasts could not be made available to the network at a date and time suitable to the network. *See id.,* pp. 19–20, at 800a–801a. Thus, the Network Contracts make clear that the media receipts from the networks were contingent on whether the network actually *broadcast* a football game, and not, as the Football Club asserts, on whether the game was simply played.

**15.** Moreover, it seems obvious that the Network Contracts would have been of little value to the networks if the right to broadcast a particular game was not an exclusive, enforceable right, and other media outlets were allowed to simultaneously broadcast the live game. *See generally* Gary R. Roberts, *The Legality of the Exclusive Collective Sale of Intellectual Property Rights by Sports Leagues,* 3 Va. J. Sports & Law 52 (Spring 2001) (discussing advertising revenues attendant to exclusive broadcast of NFL games).

Accordingly, we reject the Football Club's claim that the media receipts it received in the instant case were fees for services rendered and instead, agree with the Commonwealth Court that the media receipts were received by the NFL in exchange for the transfer of the exclusive right to broadcast NFL games live.

B. *The NFL and its Member Clubs are Copyright Owners of NFL Telecasts*

Next, the Football Club claims that, even if the media receipts it received pursuant to the Network Contracts were given in exchange for exclusive broadcasting rights, the Commonwealth Court improperly characterized the media receipts as copyright royalties from the licensing of a property right. Again, we disagree.

The United States Constitution grants Congress authority "[t]o promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8; 17 U.S.C. § 201(a). Pursuant to this authority, Congress has implemented legislation to protect a copyright, most recently by enacting the Copyright Act of 1976 ("Act").[16] The Act protects "original works of authorship fixed in any tangible medium of expression. . . ." 17 U.S.C. § 102(a).[17] One of the works of authorship entitled to copyright protection are "audiovisual works," which the Act defines

---

**16.** Act of Oct. 19, 1976, Pub.L. No. 94–553, 90 Stat. 2541 (effective January 1, 1978), *codified as amended*, 17 U.S.C. §§ 101–810. The Act expressly preempted rights under state law that are equivalent to any of the rights encompassed by a federal copyright. *See* 17 U.S.C. § 301.

**17.** The full text of Section 102(a) reads as follows:

Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;
(2) musical works, including any accompanying words;
(3) dramatic works, including any accompanying music;
(4) pantomimes and choreographic works;
(5) pictorial, graphic, and sculptural works;
(6) motion pictures *and other audiovisual works;* and

as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any...." *Id.* § 101; *see id.* § 102(a)(6).

The Football Club first argues that the media receipts cannot be copyright royalties because the right to broadcast an event live is not a property right. According to the Football Club, the broadcasting rights given by the NFL to the network merely constituted a right to create copyrightable works, not a right to use already copyrighted works.

Under the Copyright Act of 1909, the predecessor to the current Act, there was uncertainty as to whether live broadcasts were copyrightable. However, this is no longer the case because the Act expressly provides that "[a] work consisting of sounds, images, or both, that are being transmitted, is 'fixed' ... if a fixation of the work is being made simultaneously with its transmission." 17 U.S.C. § 101. Notably, the Congressional Report to Section 101 clearly shows that Congress had television coverage of sporting events, such as NFL football games, specifically in mind when it codified changes to federal copyright law in 1976:

> The bill seeks to resolve, through the definition of 'fixation' in section 101, the status of live broadcasts—sports, news coverage, live performances of music, etc.—that are reaching the public in unfixed form but that are simultaneously being recorded. When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes 'authorship.' The further question to be considered is whether there has been a fixation. If the images and sounds to be broadcast are first recorded (on a video tape, film, etc.) and then transmitted, the recorded work would be considered a 'motion

(7) sound recordings.
17 U.S.C. § 102(a) (emphasis added).

picture' subject to statutory protection against unauthorized reproduction or retransmission of the broadcast. If the program content is transmitted live to the public while being recorded at the same time, the case would be treated the same; the copyright owner would not be forced to rely on common law rather than statutory rights in proceeding against an infringing user of the live broadcast. Thus, assuming it is copyrightable—as a 'motion picture' or 'sound recording,' for example—*the content of a live transmission should be regarded as fixed and should be accorded statutory protection if it is being recorded simultaneously with its transmission.* On the other hand, the definition of 'fixation' would exclude from the concept purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the 'memory' of a computer.

H.R.Rep. No. 1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5665–66 (emphasis added). Thus, Congress has made clear that copyright protection extends to live transmissions of sporting events when they are recorded simultaneously with transmission. Given this protection under the Act, a live broadcast of a football game is protected if a videotape is being made simultaneously with the transmission. *See Detroit Lions,* 403 N.W.2d at 816 (since effective date of Copyright Act of 1976, live transmissions of sporting events have been accorded copyright protection when they are recorded simultaneously with transmission).

■ Here, it is uncontested that the live transmissions of NFL football games were recorded simultaneously with transmission.[18] Moreover, the decisions of numerous courts have recognized that it is industry practice for the NFL to make a recording simultaneously with the networks' live telecasts. *See National Football League v. PrimeTime 24 Joint Venture,* 211 F.3d 10, 11 (2d Cir.2000) ("Simultaneous with the

---

**18.** Under the Network Contracts, the networks were required to provide the production facilities for videotaping the football games, based "on the current rate card prices." *See* NFL/NBC Contract, p. 8, R.R. at 789a.

broadcast, NFL makes videotape recordings of the games, which it registers with the United States Copyright Office"); *McBee & Bruno's, Inc.*, 792 F.2d at 731–32 (since the telecasts of NFL football games are videotaped at the same time that they are broadcast, the telecasts are fixed in tangible form, and therefore copyrightable); *National Football League v. Rondor, Inc.*, 840 F.Supp. 1160, 1169 (N.D.Ohio 1993) (same); *Detroit Lions*, 403 N.W.2d at 817 (since 1978, NFL has held a copyright in the live broadcasts of games). Thus, despite the Football Club's argument to the contrary, the networks' live telecasts of the NFL football games at issue here, which were simultaneously recorded with transmission, were clearly copyrightable.[19]

Alternatively, the Football Club argues that, even if the telecasts had been copyrightable, the network could not possibly have paid the NFL copyright royalties for the use of the copyrighted work because the network, not the NFL, authored the actual game telecast and therefore owned the copyrights on those telecasts. While we agree with the Football Club that before a person can derive income from copyright royalties, he must have an ownership interest in the property whose licensing or sale gives rise to the income, authorship simply is not, despite the Football Club's argument to the contrary, an indispensable requisite of copyright ownership.

Under the Act, ownership of a copyright "vests initially in the author or authors of the work," *id.* § 201(a), but an author may transfer all or any part of his ownership at any time, *id.* §§ 201(d), 204. The law attempts to foster creation by giving

19. The Football Club argues that *National Basketball Association v. Motorola, Inc.*, 105 F.3d 841 (2d. Cir.1997), supports its argument that the telecasts were not copyrightable. However, *Motorola* merely applied the well-established rule that the actual performance of a professional sports game is not protected by copyright. As the above discussion indicates, a live telecast is copyrightable if it is simultaneously "fixed" or recorded. The court in *Motorola* concluded that the broadcasts of NBA games, as opposed to the actual games themselves, are entitled to copyright protection under the Act. *Id.* at 847. *Motorola* does not, as the Football Club asserts, support its claim that the live telecasts of the Football Club's football games were not copyrightable.

copyright owners exclusive rights to reproduce the work, prepare derivative works, distribute copies of the work, and publicly perform or display the work. *See id.* § 106(1)-(5).[20] These five rights are commonly referred to as the "bundle" of rights, each of which may be subdivided indefinitely, and each subdivision of an exclusive right may be transferred and separately owned. The Act provides that:

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law. . . .

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d) (emphasis added).[21] "Transfer of copyright ownership" is defined as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a

---

**20.** Section 106 provides:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
(5) in the case of . . . the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C. § 106.

**21.** In addition to transferring any of the bundle of rights, copyright owners may also enjoin, and seek actual or statutory damages from, anyone who violates their bundle of rights. *See* 17 U.S.C. §§ 501–505; *see, e.g., id.* § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it"). *See also id.* § 411 (setting forth procedure for providing

copyright, whether or not it is limited in time or place of effect...."[22] *Id.* § 101.

■ As one of the five rights attendant to copyright, the right to "perform" an audiovisual work means the right "to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101. Encompassed within the right to perform is the right to broadcast an audiovisual work. *See Baltimore Orioles v. Major League Baseball Players Assoc.,* 805 F.2d 663, 677 (7th Cir.1986); *see also* H.R.Rep. No. 1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5676–77 (a network is performing when it transmits the network broadcast). Accordingly, the right to broadcast live telecasts of NFL football games is part of the bundle of rights attendant to copyright and therefore, can be transferred and assigned like other rights. *See* 17 U.S.C. §§ 101, 106, 201(d); *see, e.g., Shaw,* 172 F.3d at 300.

■ In arguing that the networks were the owners of the copyrights on NFL games at issue in the instant case, the Football Club focuses *solely* on the language in § 102 stating that "the copyright vests *originally in the author.*" This argument, however, relies on far too narrow a reading of the Act and unduly restricts copyright ownership to authors of original works. Although ownership may vest initially in the author, "the owner will be the *present assignee* in the chain of title from the author." Paul Goldstein, *Copyright* § 4.4.1 (2d ed. 2000 & 2002 Supp.); *see In re Napster, Inc. Copyright Litigation,* 191 F.Supp.2d 1087, 1097 (N.D.Cal.2002) (copyright ownership arises either through assignment or authorship). As explained by one commentator, if an author assigns

advance notice of copyright ownership in live events that are simultaneously recorded).

22. Generally, an author has greater rights than one who acquires a copyright through an assignment. For example, the author has the right to terminate all transfers of ownership after 35 years. 17 U.S.C. § 203. This right is nontransferable and can only be exercised by the author or his/her heirs. *Id.* The author's right of termination is intended to counter the "unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R.Rep. No. 94–1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5740.

all rights in a novel to the publisher, or even assigns all rights to the publisher and takes back a license to dramatize the novel, it is the publisher, as assignee, that is the owner of the copyright. *Id.; see* Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright,* § 5.01[A] (2002) (the person claiming copyright ownership "must either himself be the author, *or he must have succeeded to the rights of the author* ") (emphasis added).[23] Likewise, we recognize that the networks, through their creative involvement in broadcasting the live NFL games, "authored" the copyrighted work at issue here, but this authorship does not establish that the networks have any *current* rights of copyright ownership, or that they possessed copyright ownership *at the time the NFL games were broadcast.* Rather, the copyrights were assigned to the NFL and its member clubs at the time the parties entered into the Network Contracts.

■■■■ The requirements for transferring copyright ownership are quite simple. "[I]f the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be a Magna Carta; a one-line pro forma statement will do."[24] *Effects Assocs. v. Cohen,* 908 F.2d 555, 557 (9th Cir.1990). In fact, a document does not even have to include the word "copyright" in order to constitute a valid transfer

**23.** Notably, the related federal regulations provide that a copyright claimant is either "[the] author of the work" or "[a] person or organization that has obtained ownership of all rights under the copyright initially belonging to the author." 37 C.F.R. § 202.3(a)(3). The latter category includes a person or organization that has obtained, from the author or someone in the line of title, "the contractual right to claim legal title to the copyright in an application for copyright registration." *Id.* § 202.3(a)(3) n. 1.

**24.** The Act instructs that "a transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). In addition, courts will uphold the validity of an oral agreement to transfer copyright ownership where the parties subsequently memorialize the oral agreement and agree as to the contents of that writing. *See* Robert A. Kreiss, *The "In Writing" Requirement for Copyright and Patent Transfers: Are the Circuits in*

document. *Bieg v. Hovnanian Enterprises, Inc.,* 157 F.Supp.2d 475, 480 (E.D.Pa.2001). However, the terms of any writing purporting to transfer copyright interests must be clear.[25] *Id.* (citation omitted).

Given these requirements, our review of the Network Contracts reveals that the networks clearly assigned to the NFL copyright ownership of all the live telecasts of NFL football games.[26] In the section of the Network Contracts entitled "Copyright," the language expressly provides that the "League on behalf of member clubs is deemed owner of copyright on live telecasts made under this agreement." NFL/NBC Contract, p. 21, R.R., vol. 2, at 802a. In fact, under the Network Contracts, the networks were required to announce to viewers during their football game telecasts that the NFL and its member teams owned the copyright on the telecast.[27] *Id.,* p. 22, at 803a.

*Conflict?,* 26 U of Dayton L.R. 43, 43–57 (Fall 2000) (discussing cases involving the writing requirement for transfer of copyright ownership).

25. A fundamental rule in construing a contract is to ascertain and give effect to the intent of the contracting parties. *See Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.,* 559 Pa. 56, 739 A.2d 133, 137 (1999). "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Id.* When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982); *see J.K. Willison v. Consolidation Coal Co.,* 536 Pa. 49, 637 A.2d 979, 982 (1994) (contract terms must be construed as manifestly expressed by the parties and according to the accepted and plain meaning of the language used by the parties). When reviewing the transfer of copyright ownership, courts interpret instruments of conveyance liberally, especially when no innocent third parties will be harmed. Goldstein, *Copyright, supra,* § 4.5.1. *See Imperial Residential Design, Inc. v. Palms Development Group, Inc.,* 70 F.3d 96, 99 (11th Cir.1995).

26. Notably, some sixty-five years ago a federal court sitting in Pennsylvania recognized that contracts between sports teams and broadcasters involve the transfer of a property right. *See Pittsburgh Athletic Co. v. KQV Broadcasting Co.,* 24 F.Supp. 490, 492 (W.D.Pa.1938) ("the Pittsburgh Athletic Company, by reason of its creation of the game, its control of the park, and its restriction of dissemination of news therefrom, has a property right in such news").

27. Any person who has watched an NFL game on television is familiar with this announcement and can attest that it is provided during each and every NFL telecast.

■■■ The court in *National Football League v. Insight Telecommunications Corp.*, 158 F.Supp.2d 124, 128 (D.Mass. 2001), recently found as undisputed material fact that the "NFL owns the copyright in all ... NFL game telecasts, as confirmed by the League's contracts with the networks." [28] Commentators who have addressed this issue have reached the same conclusion. *See, e.g.,* Roberts, *The Legality of the Exclusive Collective Sale of Intellectual Property Rights by Sports Leagues, supra,* at 52–53. Likewise, we conclude that the networks validly assigned copyright ownership of the live telecasts to the NFL and its member teams, including the Football Club. As a result, the Football Club, and not the networks, owned all of the rights comprised in the copyrights on the NFL game telecasts at issue here.[29]

**28.** *See also PrimeTime 24 Joint Venture,* 211 F.3d at 11; *Shaw,* 172 F.3d at 300; *Rondor,* 840 F.Supp. at 1169; *Detroit Lions,* 403 N.W.2d at 817. Indeed, the Football Club admits as much when it argues that it is "industry practice" for the networks to assign to the NFL the copyright on live broadcasts as part of their broadcasting contracts. Nevertheless, the Football Club claims that the networks could not be paying the NFL copyright royalties because authorship is the *sine qua non* of copyright. *See* Appellant's Brief, at 15. While it is true that there could be no copyright ownership without an author, the above discussion clearly shows that one need not author a work in order to obtain copyright ownership of that work, and therefore, the Football Club's argument in this regard is simply meritless.

**29.** We note our disagreement with the Commonwealth Court below to the extent that it analogized the network telecasts to "works for hire." A "work for hire" is created when a specific type of work is specially commissioned from the artist by the hiring party or when the artist is an employee of the party claiming ownership. *See* 17 U.S.C. §§ 101, 201. The "work for hire" designation is legally significant because the hiring party or the employer is considered to be the *author* of the work, and thereby has greater rights than one who obtains copyright ownership by assignment. *See supra* note 22. In addition to statutory "work for hire" situations, a party may also obtain authorship by agreement of the parties. *See In re Napster,* 191 F.Supp.2d at 1097 (discussing contracts wherein a music record label, rather than the musical artist, is specifically deemed the *author* of the work).

We agree with the Football Club that there was no evidence or argument presented to support a conclusion that the instant case involved "works for hire." It is also clear that the parties did not specifically designate the NFL as "author" of the telecasts. Given our analysis and conclusions set forth above, however, the Commonwealth Court's single reference to the Act's "work for hire" provisions is of no moment to the instant appeal.

Nevertheless, the Football Club argues that because the copyrights were only assigned to the NFL and its member teams *after* each broadcast, the networks owned the copyright on each football game at the time of the live telecast, and therefore, the networks could not have paid copyright royalties for the broadcasting rights. As an initial matter, the Football Club offers no proof for its argument that the assignment only occurred after the games were broadcast. Moreover, the Football Club's argument in this regard is contrary to the clear language of the Network Contracts, which deemed the NFL and its member teams the owner of the copyrights when the parties signed the contracts and not, as the Football Club argues, after the telecasts. Finally, the Football Club's argument apparently is based on the erroneous proposition that there is a copyright in the one-time live broadcast and a separate copyright protecting against subsequent replays of the live telecast, i.e., the tape of the football game. As explained above, however, the right to broadcast a live event is one of the bundle of rights that comes with copyright ownership. If the live broadcast of an NFL football game is simultaneously taped, the author owns the bundle of rights attendant to copyright unless, as in the instant case, the author assigns those rights.[30] Having assigned ownership of these copyrights to the NFL, the networks then obtained from the NFL the exclusive right to broadcast the live telecasts of NFL football games. *See* NFL/NBC Contract. p. 2, R.R., vol. 2, at 783a; *cf. ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 387, 413 (S.D.N.Y.1999) (cable

---

**30.** Under the Copyright Act of 1909, the predecessor to the current Act, copyright was regarded as an indivisible and single bundle of rights. The individual rights comprising that bundle could not be separately owned and could only be assigned as a whole. *See Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.*, 16 F.Supp.2d 259, 288 (S.D.N.Y.1997). Moreover, in contrast to the current Act, under the 1909 Act, ownership of a copyright could not be transferred until the work was actually published. *See* Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 10.01 (2002). Thus, under the 1909 Act, the Football Club's argument that the networks could not have assigned ownership of a copyright until *after* a live football game was finished and, as a result, completely recorded, might have some validity. Under the current Act, however, there is no such restriction on the transfer of copyright ownership.

network cannot televise live baseball games unless it obtains the right to do so from Major League Baseball). Given that the bundle of rights attendant to copyright are divisible and alienable, the fact that none of the other rights attendant to the NFL's copyrights were transferred to the networks, such as the right to copy or rebroadcast the football games, does not diminish or alter the fact that the exclusive right to broadcast the live telecasts was transferred to the networks, and in return the networks paid the NFL licensing fees for that exclusive right.

Finally, the Football Club contends that even if the NFL owned the copyright on the live telecasts of NFL games, the media receipts simply did not constitute royalty payments. Although neither the Act, the Philadelphia Code, or the BPT Regulations define the term "royalty," that term commonly refers to compensation for the use of, or right to use of, works protected by copyright.[31] *See* Black's Law Dictionary 1330–31 (6th Ed.1990) (defining royalty as "[c]ompensation for the use of property, usually copyrighted material ..., expressed as a percentage of receipts from using the property or as an account per unit produced" and "profit reserved by owner for permitting another to use the property"). Moreover, federal income tax law supports the conclusion that payments received for the licensing of intellectual property are properly characterized as copyright royalties. *See* 26 U.S.C. § 543(4)(C) (" 'copyright royalties' means compensation, however designated, for the use of, or the right to

**31.** When words of a statute are not defined, we are guided by the principles set forth in the Statutory Construction Act, which provide that such words shall be construed according to their common and approved usage. 1 Pa.C.S. § 1903. While the Statutory Construction Act is not expressly applicable to the construction of local ordinances, the principles contained therein are nevertheless useful. The objective of statutory construction is to determine the legislative intent. *Council of Middletown Township v. Benham,* 514 Pa. 176, 523 A.2d 311 (1987). Absent a contrary intent by the Philadelphia City Council, the words used in local ordinances, like statutes, should be construed according to their common and approved usage. *Id.;* 1 Pa.C.S. § 1903. Furthermore, the courts of this Commonwealth generally use dictionaries as source material to determine the common and approved usage of terms. *See Fogle v. Malvern Courts, Inc.,* 554 Pa. 633, 722 A.2d 680 (1999); *Love v. Philadelphia,* 518 Pa. 370, 543 A.2d 531 (1988).

use, copyrights in works protected by copyright issued under title 17 of the United States Code").

Here, having transferred to the networks the exclusive right to broadcast the live telecast of NFL football games, the NFL received scheduled payments in the form of media receipts. In other words, the media receipts were payment for the networks' use of the NFL's intellectual property that was protected by copyright. *See Rohmer v. Comm'r of Internal Revenue,* 153 F.2d 61–62 63 (2d Cir.1946) (where a copyright owner transfers substantially less than the entire bundle of rights conferred by the copyright, payment therefore, whether in one sum or in several payments, constitutes a royalty). While the Network Contracts do not specifically refer to this form of payment as a "royalty," the media receipts constituted copyright royalties as that term is commonly defined. *See* 26 U.S.C. § 543(4)(C); Black's Law Dictionary 1330–31 (6th Ed.1990). Importantly, other courts have characterized the networks' payment of media receipts to NFL teams as copyright royalties. *See, e.g., Cincinnati Bengals,* 637 N.E.2d at 331 (concluding that media receipts received by an NFL member club pursuant to NFL's contract with television networks were properly characterized as copyright royalties); *Detroit Lions,* 403 N.W.2d at 816–17 (same). Thus, we conclude that the media receipts constituted copyright royalties for purposes of the BPT. *Accord Columbia Associates, L.P v. Department of Treasury,* 250 Mich.App. 656, 649 N.W.2d 760 (2002) (fees paid by cable providers to television networks for the right to use network programming are copyright royalties for purposes of state's business privilege tax).

Based on the above analysis, we agree with the Commonwealth Court that the Football Club's media receipts were subject to the gross receipts portion of the BPT as copyright royalties received from the licensing of a property right, namely, the exclusive right to broadcast NFL football games.

## III. COMMERCE CLAUSE

The Football Club contends that, even if the Court finds that the media receipts were taxable as copyright royalties,

the City's imposition of the BPT on 100% of the Football Club's media receipts violated the Commerce Clause of the U.S. Constitution.[32] According to the Football Club, the Commerce Clause requires that income, regardless of the form in which it is received or whether it is characterized as copyright royalties, must be apportioned to reflect the underlying activity that generated the value. The Football Club argues that, given this constitutional requirement, only half of the media receipts, which corresponds to the percentage of the Eagles Team's games that were played in and broadcast from Philadelphia, should have been subject to the gross receipts portion of the BPT.[33] Under the circumstances presented here, we agree.

In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Supreme Court set forth a four prong test to be applied in determining whether a state or local tax violates the Commerce Clause. Specifically, the Court held that a tax will be sustained against a Commerce Clause challenge if it:

1) is applied to an activity with a substantial nexus with the taxing state;

2) is fairly apportioned;

3) does not discriminate against interstate commerce; and

4) is fairly related to benefits provided by the state.

*Id.* at 279, 97 S.Ct. 1076.[34] In the instant case, the primary dispute is whether the tax is fairly apportioned within the

**32.** The Commerce Clause states that "Congress shall have Power . . . [to] regulate Commerce with foreign nations, and among the several States. . . ." U.S. Const., art. I, § 8, cl. 3.

**33.** We note that two organizations, the Committee on State Taxation and the Pennsylvania Chamber of Business and Industry, provided *amicus curiae* briefs in support of the Football Club, limiting their arguments solely to the issue of whether the City's imposition of the BPT in this case violated the Commerce Clause.

**34.** In *Complete Auto*, a taxpayer challenged the State of Mississippi's franchise tax on the privilege of operating a business within the state. The tax was assessed equally on all gross income derived from transportation for hire within Mississippi but the taxpayer, who transported cars manufactured outside of Mississippi to dealers within the state, argued that Mississippi had illegally taxed the privilege of engaging in

meaning of the second prong of *Complete Auto's* test. As we conclude that it is not, we need not address the remaining prongs of the test.

The "central purpose behind the apportionment requirement is to ensure that each state taxes only its fair share of an interstate transaction." *Goldberg v. Sweet,* 488 U.S. 252, 260, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989) (citation omitted); *see Dep't of Revenue of the State of Washington v. Ass'n of Washington Stevedoring Cos.,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978) (a state tax impermissibly impedes on interstate commerce when it does not fairly reflect the income attributable to the taxing jurisdiction); Hartman, *Federal Limitations on State and Local Taxation, supra,* at § 2.17 (the principle of "fair share" is derived from and interrelated with the Supreme Court's multiple taxation doctrine). When a state taxes more than its fair share, it creates the risk that the portion of value by which it exceeded its fair share will be taxed again by a state properly laying claim to its fair share of the value being taxed, thereby subjecting the taxpayer to multiple taxation. *See Oklahoma Tax Comm'n v. Jefferson Lines,* 514 U.S. 175, 184, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (avoidance of the *risk* of multiple taxation is the test of apportionment).

As a threshold argument, the City asserts that apportionment is not even necessary in the instant case because the BPT, as a gross receipts tax upon the privilege of doing business, is exempt from the Commerce Clause's apportionment requirement. We disagree.

As a general rule, gross receipts taxes imposed upon receipts from interstate commerce are prohibited unless the tax is apportioned to the taxpayer's activities in the state. *See generally* Laurence H. Tribe, *American Constitutional Law*

an interstate commercial activity. Applying the four part test, the Supreme Court concluded that Mississippi's franchise tax did not violate the Commerce Clause because it was only imposed on business conducted *within* the state and did not tax income earned outside its borders, thereby resulting in a fair apportionment of the taxpayer's income. *Id.* at 287.

§ 6–19 & 6–20, at p. 465 (2d ed.1988). Historically, however, the Supreme Court has not required apportionment of gross receipts from activities involving manufacturing and sales. In that regard, the Supreme Court has explained that unlike other business activities, manufacturing and sales are separate and discrete activities, each of which transpire completely within a single jurisdiction. *See, e.g., Tyler Pipe Industries, Inc. v. Washington State Dep't of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987). Thus, in levying a gross receipts tax, the state of origin can tax the manufacturing activity, and the state of destination can tax the selling activity, without the risk of multiple taxation for the same activity.[35]

In a trio of cases involving the State of Washington's business and occupation tax, which was imposed upon the gross receipts received by a business from in-state selling or manufacturing, the Supreme Court analogized a gross receipts tax to a sales tax on the basis that both types of tax tend to measure the gross proceeds of *in-state* business activity. *See Tyler Pipe*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199; *Standard Pressed Steel Co. v. Washington Dept. of Rev.*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975); *General Motors Corp. v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964). Building on this analogy, the City seems to argue here that *all* gross receipts taxes, and not just those generated by activities of manufacturing and sales, are excluded from the apportionment requirement. However, contrary to the City's assertions, the Supreme Court has never held that gross receipts taxes as a whole are immune from apportionment. In fact, since the last of the trio of cases on which the City relies,

---

**35.** The Supreme Court has explained that:

A sale of goods is most readily viewed as a discrete event facilitated by the laws and amenities of *the place of sale,* and the transaction itself does not readily reveal the extent to which completed or anticipated interstate activity affects the value on which a buyer is taxed. We have therefore consistently approved taxation of sales without any division of the tax base among different States, and have instead held such taxes properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future. *Jefferson Lines,* 514 U.S. at 186, 115 S.Ct. 1331.

the Supreme Court has distanced itself from the gross receipts tax and sales tax analogy and made clear in *Oklahoma Tax Commission v. Jefferson Lines* that a gross receipts tax is "simply *a variety of tax on income, which [is] required to be apportioned* to reflect the location of the various activities by which it [is] earned." [36] 514 U.S. at 190, 115 S.Ct. 1331 (emphasis added). Thus, we simply cannot agree with the City's argument that a gross receipts tax, such as the BPT, is wholly immune from the constitutional requirement of fair apportionment.[37]

**36.** Tax commentators hailed the Supreme Court's decision in *Jefferson Lines* for breaking the "misconceived analogy" between sales taxes and gross receipts taxes. *See* Piper & Eggen, *Gross Receipts Taxes: General Principles, supra,* at 1610:0008a.

> While *Jefferson Lines* sustained states' power to impose unapportioned retail sales taxes on the sale of services involving interstate activities, *it strengthened taxpayers' ability to assert the position that gross receipts taxes imposed on business activity must be fairly apportioned if they are measured by receipts from interstate business activity.* By drawing a sharp line between gross receipts taxes and retail sales taxes and characterizing the gross receipts tax in *Central Greyhound Lines, Inc. v. Mealey,* [334 U.S. 653, 68 S.Ct. 1260 (1948),] as akin to an income tax, the Court has called into question some of its earlier decisions that approved, with little analysis, unapportioned gross receipts taxes merely because they were imposed on a "local" subject and could loosely be analogized to retail sales taxes.

Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 18.08[5], at 18–65 to –66 (3d ed.1998) (footnote omitted) (emphasis added).

> In addition, since *Jefferson Lines,* other jurisdictions have recognized taxpayers' rights to apportionment of a gross receipts tax, just like all other forms of taxation upon income. *See, e.g. Polychrome Int'l Corp. v. Krigger,* 5 F.3d 1522, 1540 (3d Cir.1993) ("any tax—including one imposed on, or measured by, gross receipts from interstate and foreign commerce—must be apportioned to reflect only that business activity attributable to intrastate commerce"); *City of Winchester v. American Woodmark Corp.,* 252 Va. 98, 471 S.E.2d 495, 495, 498 (1996) (recognizing taxpayers' right to apportionment of a gross receipts tax); *Southern Pacific Transp. Co. v. Arizona, Dep't of Revenue,* 202 Ariz. 326, 44 P.3d 1006, 1014 (2002) ("In our view, *Jefferson Lines* compels the view that gross receipts taxes … must be apportioned to comply with the … Commerce Clause."); *see generally,* Hellerstein & Hellerstein, *State Taxation,* ¶ 18.08[5].

**37.** In a related argument, the City asserts that a business privilege tax, as a distinct type of tax on business receipts, need not be apportioned. While acknowledging that the U.S. Supreme Court's Commerce Clause jurisprudence mandates fair apportionment, the City argues that a business privilege tax is distinguishable from other forms of taxation on

 The Football Club next argues that if the Court concludes that the BPT is in fact subject to the fair apportionment prong of the *Complete Auto* test, the BPT in the instant case violates that prong. To be fairly apportioned, a tax must be both internally consistent and externally consistent. *See Goldberg,* 488 U.S. at 260–61, 109 S.Ct. 582. To pass the internal consistency test, a tax must be structured so that if every taxing jurisdiction were to apply the identical tax, the taxpayer would not be subjected to a risk of double taxation. *Id.* at 261, 109 S.Ct. 582. Thus, the internal consistency test focuses on the text of the challenged statute and hypothesizes a situation where other states have passed an identical statute. *Id.* The Football Club first argues that the City's imposition of the BPT violated the internal consistency test because if every jurisdiction applied the same kind of tax, the Football Club would be subject to the risk of double taxation. This claim fails.

In assessing the Football Club's BPT liability, the City relied on BPT Regulation 322, which provides that where a taxpayer maintains its commercial domicile in Philadelphia, all copyright royalties received by the taxpayer are to be included

business revenue. In making this argument, the City fails to recognize that *Complete Auto,* the cornerstone of modern Commerce Clause jurisprudence, involved a gross receipts tax imposed on the privilege of doing business, even though it was labeled a "franchise" tax and was measured by receipts from "gross income." The Supreme Court in *Complete Auto* ultimately upheld the tax because it was imposed only on *instate* activity, but the Court clearly recognized that a tax on the privilege of conducting business is subject to the fair apportionment requirement. 430 U.S. at 287, 97 S.Ct. 1076; *see, e.g., Gwin, White & Prince,* 305 U.S. at 438–39, 59 S.Ct. 325 (gross receipts tax on the privilege of conducting business must be properly apportioned); *American Woodmark,* 471 S.E.2d at 498 (same). *See also O.H. Martin Co. v. Sharpsburg Borough,* 376 Pa. 242, 102 A.2d 125, 126–27 (1954) (recognizing the important distinction between intrastate and interstate commerce when imposing a business privilege tax on gross receipts, and concluding that a Borough could impose a business privilege tax without apportionment because the ordinance taxed only those receipts derived from *intrastate* business, and therefore, there was no threat of the borough taxing outside its border); *accord Wagman, Inc. v. Manchester Township,* 112 Pa.Cmwlth. 357, 535 A.2d 702, 706 (1988) (apportionment of business privilege tax not required where the ordinance specifically exempted from taxation receipts earned in interstate commerce).

in the measure of tax, unless the royalties are attributable to business conducted at a place of business regularly maintained by the taxpayer outside of Philadelphia. BPT Regulations § 322. Hypothetically, if every jurisdiction were to impose such a tax, then each jurisdiction would only be able to tax the copyright royalties of those taxpayers commercially domiciled within its boundaries. Under this paradigm, the Football Club, being domiciled in Philadelphia, could not have its media receipts subjected to such a tax in other jurisdictions, and as a result, its media receipts would not be subject to double taxation. We therefore agree with the Commonwealth Court below that the BPT, as applied by the City to the Football Club's media receipts, did not fail the internal consistency test.[38]

The Football Club also argues, however, that by imposing the BPT upon 100% of the media receipts, the City violated the external consistency test because it taxed business activity that occurred in other taxing jurisdictions. We agree.

 The external consistency requirement is a subjective test that asks whether a state taxed only that "portion of the revenues from the interstate activity which reasonably reflects the instate component of the activity being taxed." *Goldberg*, 488 U.S. at 262, 109 S.Ct. 582. External consistency looks to the economic justification for the state's claim upon the value being taxed in order to discover whether a state is taxing economic activity that occurred in other jurisdictions. *Jefferson Lines*, 514 U.S. at 185, 115 S.Ct. 1331. In essence, there must be a "rational relationship between the income attributed to the [s]tate and the intrastate values" of the business being taxed. *Hunt–Wesson, Inc. v. Franchise Tax Bd. of California*, 528 U.S. 458, 464, 120 S.Ct. 1022, 145 L.Ed.2d 974 (2000) (citations omitted); *see Moorman Mfg. Co.*

**38.** While we agree with the conclusion reached by the Commonwealth Court as to internal consistency, we note that the Commonwealth Court misinterpreted *Complete Auto* by requiring the Football Club to present evidence that it was *actually* taxed in other jurisdictions. *Philadelphia Eagles*, 758 A.2d at 251. The Supreme Court has made clear that the proper inquiry is whether a taxpayer is subjected to the *risk* of multiple taxation. *See Jefferson Lines*, 514 U.S. at 184, 115 S.Ct. 1331.

*v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 13.5(e) (2d ed.1992). Accordingly, an objecting taxpayer will be successful in striking down a tax if it demonstrates by clear and cogent evidence that the income attributed to the state either is "out of all appropriate proportion to the business transacted by the [taxpayer] in that state," *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell,* 283 U.S. 123, 135, 51 S.Ct. 385, 75 L.Ed. 879 (1931), has "led to a grossly distorted result" for the taxpayer, *Norfolk & Western Ry. Co. v. Missouri State Tax Comm'n,* 390 U.S. 317, 326, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968), or is "inherently arbitrary" or "produced an unreasonable result," *see Moorman Mfg. Co.,* 437 U.S. at 274, 98 S.Ct. 2340 (quoting *Underwood Typewriter Co. v. Chamberlain,* 254 U.S. 113, 121, 41 S.Ct. 45, 65 L.Ed. 165 (1920), and citing *Norfolk & Western Ry. Co.,* 297 U.S. 682, 56 S.Ct. 625, 80 L.Ed. 977; *Bass, Ratcliff & Gretton v. State Tax Comm'n,* 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282 (1924)).

Applying this standard here, we find that the Football Club has demonstrated by clear and cogent evidence that the City's imposition of the BPT in the instant case violated the Commerce Clause. The City's levy on 100% of the Football Club's media receipts, when half of the Eagles Team's football games were telecast from NFL venues outside of Philadelphia, was inherently arbitrary and had no rational relationship to the Football Club's business activity that occurred *in Philadelphia. Accord City of Winchester v. American Woodmark Corp.,* 252 Va. 98, 471 S.E.2d 495 (1996) (City's levy on 100% of company's gross receipts, based solely on presence of company headquarters in City, when manufacturing, distribution, sales and service facilities were located elsewhere, was "out of all appropriate proportion to" and had no "rational relationship" to the business transacted in City, and thus, failed the external consistency test). By imposing the BPT on 100% of the media receipts when only 50% of the receipts were generated from games played in and broadcast from Philadelphia, the City actually *doubled* the Football Club's tax

assessment on the media receipts.[39] In this regard, the City's BPT assessment was plainly "out of all proportion" to the Football Club's business activities in Philadelphia that generated the payment of media receipts.[40] *Hans Rees' Sons,* 283 U.S. at 135, 51 S.Ct. 385. In addition, by reaching beyond its borders and taxing receipts from the Football Club's business activities in other jurisdictions, the City clearly put the Football Club at risk of being subjected to multiple taxation.[41]

In nevertheless concluding below that there was no failure of external consistency, the Commonwealth Court found that the City had an economic justification for taxing 100% of the Football Club's copyright royalties, i.e., the media receipts. *See Philadelphia Eagles Football Club,* 758 A.2d at 251–53. The court noted that copyrights, like other intellectual property rights, constitute intangible property, *id.* at 252 (citing

**39.** Although not part of any constitutional test, the U.S. Supreme Court has analyzed tax discrepancies under the external consistency test on a percentage basis. *See, e.g., Container Corp. of America v. Franchise Tax Board,* 463 U.S. 159, 183–84, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (fourteen percent discrepancy asserted by taxpayer deemed constitutionally acceptable); *Norfolk & W. Ry.,* 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201 (one-hundred sixty-six percent difference in tax due under tax statute and using actual values deemed outside the allowable margin of error). While creating no benchmark for constitutional purposes, we conclude under these facts that the 100% discrepancy between the tax assessed by the City and the tax due if apportioned is constitutionally unacceptable.

**40.** Although the Tax Review Board found that only 50% of the Football Club's receipts should have been subjected to the gross receipts portion of the BPT, this conclusion was based upon the Board's erroneous finding that the media receipts were fees for services rendered and therefore, we cannot simply reinstate the Board's decision.

**41.** We recognize, of course, that if we were to conclude that the BPT is externally consistent, as the Commonwealth Court did, *all* multi-jurisdictional businesses with a presence in Philadelphia, not just the Football Club, would be subject to the threat of duplicative taxation. As such, we agree with the argument proffered by *amicus* Pennsylvania Chamber of Business and Industry, namely, that such a result would discourage business in Philadelphia, and would also have a chilling effect on all Pennsylvania business. Business activities, a fraction of which *should* be taxable by the City, would instead be taxed *twice.* The effect of burdening businesses with such tax liabilities would make Philadelphia an unwelcome destination for new businesses, would discourage existing business from expanding and, in fact, would encourage businesses to leave Philadelphia altogether.

*Lucker Man'fg, Inc. v. Home Ins. Co.*, 23 F.3d 808, 819 (3d Cir.1994)), and stated that for purposes of taxation, the situs of intangible personal property is at the domicile of the owner or taxpayer. *Id.* (citing *Commonwealth v. Pennsylvania Coal Co.*, 197 Pa. 551, 47 A. 740 (1901)). Citing these principles, the court found that any income from intangible personal property, such as the copyright royalties at issue here, must be allocated entirely to the domicile of the taxpayer. Alternatively, the court explained that the City could tax 100% of the royalties because the economic activities that gave rise to those royalties took place in Philadelphia. On these bases, the Commonwealth Court held that taxing the Football Club's media receipts without apportionment was constitutional under *Complete Auto.*

In the first instance, the Commonwealth Court's decision fails to properly identify the source of the underlying activity that generated the media receipts here. Surprisingly, the Commonwealth Court did not even recognize where the football games were played and broadcast from, concluding instead that the "economic activities of playing football, recording and broadcasting the football games ... take place in Philadelphia." *Philadelphia Eagles*, 758 A.2d at 252. In so concluding, the Commonwealth Court erroneously assumed that the Football Team only earned media receipts from football games played in Philadelphia and earned no media receipts from away games, and that the other NFL football team involved in each game in Philadelphia earned no media receipts for those games. There is simply no support in the record for these assumptions. In fact, as indicated by our previous discussion regarding the Network Contracts, the activity that generated the media receipts was the live broadcast of football games played by the Eagles Team, which occurred both in Philadelphia and at other teams' venues outside of Philadelphia. *See J.D. Adams Mfg. Co. v. Storen*, 304 U.S. 307, 311, 58 S.Ct. 913, 82 L.Ed. 1365 (1938) ("the vice of the statute as applied ... is that the tax includes in its measure, without apportionment, receipts derived from activi-

ties in interstate commerce").[42] Accordingly, to the extent that the Commonwealth Court based its holding on the fact that the economic activity giving rise to the income occurred in Pennsylvania, it simply rested its analysis on erroneous facts.

The Commonwealth Court further erred in concluding that all income from intangible personal property must be allocated to the domicile of the taxpayer. In reaching that conclusion, the Commonwealth Court apparently mistook the external consistency test as asking whether the City had a justification for taxing *any* of the media receipts, rather than whether the City could fairly lay claim to *all* of the media receipts. *See Jefferson Lines*, 514 U.S. at 185, 115 S.Ct. 1331 (external consistency looks to the economic justification for a jurisdiction's claim upon the value being taxed in order to discover whether a state is taxing economic activity that occurred in other jurisdictions). Although domicile itself affords a jurisdiction the ability to tax the income of a domiciliary corporation, that jurisdiction may not tax all of that income where another state taxes, or has the authority to tax, an apportioned share of that income. *See Japan Line Ltd. v. County of Los Angeles*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). Moreover, the Commerce Clause precludes a taxing jurisdiction from denying a taxpayer the right

**42.** The City argues that the Commonwealth Court properly determined that the City's allocation of 100% of the Football Club's media receipts to Philadelphia satisfied the external consistency test for fair apportionment because, according to the City, "the proportion of NFL media receipts allocated to the Eagles (and taxed by Philadelphia) is the same as the proportion of total NFL games played in Philadelphia." Brief for Appellee at 8; *see id.* at 21. However, this argument focuses on how much of the *NFL's* total receipts are taxable in Philadelphia as represented by the share of NFL games that were played in Philadelphia, instead of the proper inquiry, which involves determining where the Eagles Team earned its share of the NFL media receipts and calculating the portion of the Football Club's media receipts that were taxable in Philadelphia.

Even if we were to focus on the total number of NFL football games, as the City urges us to do, the City's argument completely ignores the fact that *two teams* played in each football game that was telecast and generated the media receipts, not just one team. Again, there is simply no support in the record for the City's assumption that the Football Club earned 100% of its annual media receipts from the eight football games played in and broadcast from Philadelphia each year.

to a division of the tax base when a portion of that tax base is taxable in other jurisdictions. *See* Jerome R. Hellerstein & Walter Hellerstein, *State Taxation*, § 8.02[4][a] (3d ed. 1998 & Supp.2001) (a state may not restrict a taxpayer's right to divide the tax base if it conflicts with the taxpayer's rights under the Constitution); *cf.* James H. Peters, *Sales/Use Taxes: Is Fair Apportionment a Proper Test?*, 6 State Tax Notes 105, 105 (1994) (the primary objective of the fairness principle "is to confine a tax to activities or transactions occurring within the taxing state"). The fact that the Football Club was commercially domiciled in Philadelphia and played some of its games there only meant that the City was entitled to tax its fair share of the receipts, not *all* of the receipts as the Commonwealth Court found.[43] *Accord Appraisal Review Bd. v. Tex–Air Helicopters, Inc.*, 970 S.W.2d 530 (Tex.1998) (domiciliary state may not tax values that are taxable elsewhere); *see General Motors Corp. v. City & County of Denver*, 990 P.2d 59, 71 (Colo.1999) ("In the context of income

---

**43.** Nevertheless, the City asserts that *Spielvogel, Inc. v. Township of Cheltenham*, 144 Pa.Cmwlth. 510, 601 A.2d 1310 (1992), mandates inclusion of 100% of the Football Club's media receipts to its commercial domicile. However, the court in *Spielvogel* did not hold so broadly and, in fact, the ordinance at issue there "was intended to tax only intrastate income," so there was simply no issue of multistate taxation. *Id.* at 1315. *See Complete Auto*, 430 U.S. at 287, 97 S.Ct. 1076 (tax upheld because it taxed only *instate* value). Thus, the City's reliance on *Spielvogel* for such a broad proposition is misplaced. The City also asserts that *Gilberti v. City of Pittsburgh*, 511 Pa. 100, 511 A.2d 1321 (1986), supports the imposition of the BPT on 100% of the gross receipts of the Football Club, regardless of where the receipts were earned. However, *Gilberti* did not, as the City suggests, enact a *per se* rule allowing a city to tax 100% of the gross receipts of any business domiciled within its jurisdiction. Rather, in *Gilberti*, this Court concluded that a taxing jurisdiction is not required to *ignore* the contribution provided by a business maintaining a base of operations within the taxing jurisdiction. *Id.* at 236, 511 A.2d 1321; *accord Maxland Dev. Corp. v. Director of Revenue*, 960 S.W.2d 503, 506 (Mo.1998). *See also Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 444–46, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980) (stating that there is "no adequate justification" for a rule that "requires allocation of dividend income to a single situs rather than apportionment among the States," and ultimately concluding that the taxing state's "interest in taxing a proportionate share of [the taxpayer's] dividend income [was] not overridden by any interest of the State of commercial domicile").

taxes or taxes on gross receipts, apportionment *must* take into account the location where revenue is generated.").[44]

Thus, we disagree with the Commonwealth Court's conclusion that the imposition of the BPT in the instant matter was externally consistent, and instead find that it was grossly disproportionate to the activity that actually occurred in the City. Rather than taxing 100% of the media receipts, the City should have apportioned the tax to exclude from the gross receipts calculation of the BPT the substantial media receipts attributable to the one out of every two football games that were played by the Eagles Team in, and telecast from, other taxing jurisdictions.[45] As the City failed to do so, its imposi-

44. In a related argument, the City asserts that its assessment of 100% of the Football Club's receipts was constitutional because it was done in accordance with Regulation 322, which provides that where a taxpayer maintains its commercial domicile in Philadelphia, "all patent, copyright, and trademark royalties received are to be included in the measure of the tax," unless "attributable to business conducted at a place of business regularly maintained by the taxpayer outside of Philadelphia." BPT Regulations § 322. The City claims that because the Football Club was domiciled in Philadelphia, and failed to show that it maintained a regular place of business elsewhere, the City properly levied the BPT upon 100% of the media receipts under Regulation 322. However, the fact that the City created such a rule for its own regulations does not exempt the City from adhering to the constitutional mandate to fairly apportion revenue generated from interstate business activities. Just as the City seeks to collect its fair share of revenue from businesses operating in its jurisdiction, whether or not a particular business actually maintains an office in Philadelphia, it cannot deny a taxpayer "the right to a division of the tax base, merely because the taxpayer has not established an office outside the state, if the taxpayer is carrying on other activities … that will subject it to income tax in those other states." Hellerstein & Hellerstein, 2 *State Taxation, supra,* ¶ 8.02[4][c].

45. We emphasize that the City's application of Regulation 322, and not the BPT in its entirety, violated the external consistency test. The BPT contains an explicit apportionment formula instituting a geographical limitation on the gross receipts portion of the BPT, *see* Philadelphia Code § 19–2601 ("taxable receipts" limited to those receipts earned in Philadelphia), but Regulation 322 does not contain a corresponding limitation. By employing Regulation 322 to tax revenues earned from the live broadcasts originating outside Philadelphia, the City taxed beyond the borders of its jurisdiction, and the City's imposition of the BPT in this manner was not rationally related to its power and interest. Despite the City's assertion that there is "no rational basis" for limiting the imposition of the BPT to one-half of the Eagles Team's games, we

tion of the BPT in the instant case failed the external consistency test and violated the Commerce Clause.

## IV. CONCLUSION

For the reasons outlined above, we agree with that portion of the Commonwealth Court's decision holding that the Football Club's media receipts received pursuant to the Network Contracts were subject to assessment under the gross receipts component of the BPT as copyright royalties, but disagree with that portion of the decision holding that the Commerce Clause does not require apportionment of the media receipts. Accordingly, we reverse and remand the matter to the Court of Common Pleas of Philadelphia County to apportion the media receipts in a manner consistent with this opinion. *See Commonwealth v. General Foods Corp.*, 429 Pa. 266, 239 A.2d 359 (1968).

Justice SAYLOR files a concurring opinion in which Justice LAMB joins.

Justice CASTILLE files a concurring and dissenting opinion in which Justice NEWMAN joins.

### *CONCURRING OPINION*

Justice SAYLOR.

The majority's conclusion that the media receipts constituted copyright royalties is not without some appeal, and finds support in published opinions from two other jurisdictions' intermediate appellate courts. *See Cincinnati Bengals, Inc. v. Papania*, 92 Ohio App.3d 785, 637 N.E.2d 330, 331 (1993) *(per curiam )*; *Detroit Lions, Inc. v. Department of Treasury*, 157 Mich.App. 207, 403 N.W.2d 812, 817 (1986) *(per curiam )*. It nonetheless rests upon the proposition that the copyrights were assigned to the NFL at the time the Network Contracts were signed. *See* Majority Opinion, *slip op.* at 20, 23–24. As

find that the only media receipts that had a rational relationship the taxing jurisdiction were those that were generated from the games played and broadcast live from Philadelphia.

those instruments were executed before any of the games occurred, however, the underlying works of authorship—i.e., the telecasts—and their associated copyrights, were not yet in existence.[1] Thus, the prospective assignment, as memorialized in the contracts, was not consummated until each game was played and televised.

While I agree with the majority that the monies at issue are not fees for services rendered, *see* Majority Opinion, *slip op.* at 10–13, in light of the *sui generis* nature of the networks' activities in both authoring and broadcasting the telecasts of the games, I believe that the media receipts are best understood as compensation for the exclusive right to simultaneously create and use intellectual property (the telecasts of the games) ultimately subject to copyright protection. They are unlike royalties in that the benefit obtained by the networks in return for such monies is not the utilization of intellectual property already created, but the exclusive privilege of capturing images of others' activities and thereby creating, in the first instance, the subject works. The consideration provided in return for such right consists of the fees paid as well as the prospective transfer of copyrights to the NFL; upon broad-

1. A copyright comes into existence when a work of authorship is created and fixed in some tangible medium of expression. *See* 17 U.S.C. § 102(a); *see also* § 302(a) (providing that copyright in a work subsists "from its creation"); *Rodrigue v. Rodrigue,* 218 F.3d 432, 436 & n. 15 (5th Cir.2000) (stating that copyright "arises at the moment of creation of the work") (citing 1 Nimmer & Nimmer, NIMMER ON COPYRIGHT, § 505(B)(1)); *cf. Cable News Network, Inc. v. Video Monitoring Svcs. of Am.,* 940 F.2d 1471, 1480–81 (11th Cir.1991) (observing that there is no such thing as a copyright in a work that has not yet come into existence), *vacated on other grounds,* 949 F.2d 378 (11th Cir.1991). Ownership of the copyright vests initially in the author of the work. *See* 17 U.S.C. § 201(a); *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989) (*"CCNV"*). Unless the work is a work-for-hire, the party in which copyright initially vests is the author-in-fact. *See CCNV,* 490 U.S. at 737, 109 S.Ct. at 2171 (indicating that "the author is the party who actually creates the work"). I agree with the majority that the televised games were not works for hire. Additionally, there does not appear to be any dispute that the networks are the authors-in-fact of the telecasts; that the telecasts are subject to copyright protection; or that the copyright in the telecasts vested initially in the networks. *See* Majority Opinion, *slip op.* at 17.

cast and creation of each telecast, transfer of the copyright then occurred as to all future uses.[2]

For these reasons, I would hold that the media receipts were not copyright royalties for purposes of Section 322 of Philadelphia's Business Privilege Tax. Since non-royalty revenues are only assessed to the extent the underlying business activities take place within the city, I concur in the Court's ultimate determination that, for the tax years at issue, the media receipts should be apportioned accordingly.

Justice LAMB joins this concurring opinion.

## CONCURRING AND DISSENTING OPINION

Justice CASTILLE.

I agree with the lead opinion that the Commonwealth Court correctly found that the Philadelphia Eagles Football Club's media receipts resulting from the television broadcast of football games were subject to the City of Philadelphia's Business Privilege Tax (BPT) because the media receipts constitute copyright royalties for the licensing of a property right. I respectfully disagree, however, with the lead opinion's conclusion that the City's failure to apportion those media receipts based upon the percentage of games the Football Club plays in Philadelphia violates the Commerce Clause. Because I would affirm the Commonwealth Court's holding that the City's taxation of the entirety of the media receipts did not violate the Commerce Clause, I respectfully dissent.

As the plurality opinion notes, in the years relevant to this appeal, the Football Club was one of twenty-eight member

2. In this regard, I note that the court in *Detroit Lions* relied upon *Commissioner of Internal Revenue v. Affiliated Enterprises,* 123 F.2d 665 (10th Cir.1941), for the conclusion that the existence of a patent or copyright is not necessary to characterize payments as royalties. *See Detroit Lions,* 403 N.W.2d at 817. Such reliance was arguably misplaced, however, as *Affiliated Enterprises'* essential thesis was that royalties could be paid for the use of technological improvements, trade secrets, and trademarks that were not subject to patent or copyright protection. *See Affiliated Enterprises,* 123 F.2d at 668. In such instances, unlike the present case, the underlying intellectual property had to exist prior to its use.

teams in the National Football League (NFL). As such, the Football Club received a 1/28th share of the media receipts that were paid to the NFL by various major television networks in exchange for the right to broadcast live NFL football games. The Football Club's principal place of business is in Philadelphia. The City of Philadelphia sought to tax the Football Club's 1/28th share of the media receipts. This Court granted review to consider the Commonwealth Court's holdings that: (1) the media receipts may be taxed only where the taxpayer maintains its commercial domicile; and (2) the receipts need not be apportioned premised upon the percentage of games the Football Club actually plays in Philadelphia.

The first part of the lower court's holding that the media receipts are properly taxed where the taxpayer maintains its commercial domicile is amply supported by the tax regulations themselves and long-standing precedent of this Court. The pertinent regulation specifically provides that royalties are included in the net income of a business domiciled in Philadelphia:

(a) "Net income" shall, at the option of the taxpayer, which option shall not be revocable [sic] by the taxpayer after it has been exercised as provided by the collector, be either:

(1) The net gain from the operation of a business, after provision for all allowable costs and expenses actually incurred in the conduct thereof, **where a taxpayer, whether a domestic or foreign corporation or any other type of business entity, maintains its commercial domicile in Philadelphia, all patent, copyright and trademark royalties received are to be included in the measure of tax unless attributable to business conducted at a place of business regularly maintained by the taxpayer outside of Philadelphia.**

City of Philadelphia Business Privilege Tax Regulations § 322 (emphasis added). More than a century ago, this Court held that the situs of intangible personal property is the domicile of the owner or taxpayer. *Commonwealth v. Pennsylvania Coal Co.*, 197 Pa. 551, 47 A. 740, 741 (1901). *See also Commonwealth v. Universal Trades, Inc.*, 392 Pa. 323, 141 A.2d 204,

206 (1958); *Commonwealth v. Semet-Solvay Co.*, 262 Pa. 234, 105 A. 92, 93 (1918); *In re Lewis' Estate*, 203 Pa. 211, 52 A. 205 (1902). Analyzing Pennsylvania and Wisconsin law, the Third Circuit has determined that copyrights are intangible property. *Lucker Manufacturing Inc. v. Home Insurance Co.*, 23 F.3d 808, 819 (3d Cir.1994) (citing *In re Estate of MacFarlane*, 313 Pa.Super. 397, 459 A.2d 1289, 1292 (1983); *United States Fidelity & Guar. Co. v. Barron Indus., Inc.*, 809 F.Supp. 355, 360 (M.D.Pa.1992); *Columbia Gas Transmission Corp. v. Commonwealth*, 19 Pa.Cmwlth. 523, 339 A.2d 912, 918 (1975)). I agree with the Third Circuit that copyrights are intangible property. Therefore, they are properly taxable under a fair reading of the statute in the owner's domicile which, in this case, is the City of Philadelphia.

Turning to the Commerce Clause question, I agree with the Commonwealth Court's holding that the media receipts paid to the Philadelphia Eagles organization need not be subdivided and apportioned, for purposes of the Philadelphia BPT, based upon where the Football Club's games are played. As the lead opinion notes, the Commerce Clause issue is governed by the United States Supreme Court's four-prong test set forth in *Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). At issue here is the second prong of that test, which requires that the local tax be fairly apportioned. *Id.* at 279, 97 S.Ct. 1076. To be deemed fairly apportioned, a tax must be both internally and externally consistent. *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 185, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). A tax is internally consistent where the imposition of an identical tax by every other state would impose no additional burden to interstate commerce that intrastate commerce would not also bear. *Id.* I agree with the plurality that the Philadelphia BPT unquestionably is internally consistent.

The question of external consistency is resolved by determining whether a state taxes only that portion of the revenues fairly attributable to economic activity within the taxing state. *Id.* As the Commonwealth Court concluded, the taxing regulation at issue here, as well as established case law, provide that

copyright royalties are taxable by the domicile of the taxpayer. Because the royalties are taxable only by the domicile, it follows that the BPT taxes only revenues attributable to economic activity within Philadelphia. The copyright royalties are the intangible property of the Eagles Football Club, and, as such, they follow the Club. Those royalties are distributed among the member teams of the NFL upon an equal basis— 1/28th to each of the 28 teams operating in different cities— and not premised upon which games are played where. In short, in my view, the deciding factor for copyright royalty purposes is not the underlying activity of playing football, the gate receipts or the location of the game, because those factors are not relevant to team ownership and thus the situs of the copyrights. The situs of the copyrights in this case clearly is Philadelphia. Philadelphia has not sought to reach any of the other 27/28ths of the media receipts paid to the NFL, but only that portion which has been paid to the single Philadelphia corporation.

The plurality's focus upon game-day to further subdivide the one twenty-eighth share of the media receipts each NFL club receives not only ignores the deemed situs of the copyrights but is also, in my view, both artificial and impractical. Even if game-day is deemed the proper focus, it is indisputable that 1/28th of the NFL activity generating the media royalties occurs in Philadelphia since other cities' NFL teams play in Philadelphia at the Eagles' home games. Thus, Philadelphia properly may tax up to 1/28th of the media royalties paid to the NFL—not coincidentally, the very amount paid to the Eagles Football Club, which hosted 1/28th of NFL regular season games. The plurality's approach would require the City of Philadelphia to tax that portion of media receipts of other NFL teams attributable to games they played in Philadelphia (one-sixteenth of their media receipts for each game they played here), while assuming that other NFL cities would be permitted to tax visiting NFL teams' royalties in the same fashion. Calculation and collection of those taxes would require considerable effort on the part of the cities in which NFL games are played, inevitably would result in disputes

and litigation over the imposition of taxes by cities in which the NFL teams are not commercially domiciled, and would lead to unevenness in application.

Because I believe the BPT was properly assessed against the Eagles Football Club by the City of Philadelphia based upon the media royalties actually paid to it in its domicile, I would affirm the Commonwealth Court's decision.

Justice NEWMAN joins this concurring and dissenting opinion.